UNITED STATES, Appellee

v.

DON R. WEEMS, Corporal, U. S. Army, Appellant

3 USCMA 469, 13 CMR 25

No. 2072

Decided December 11, 1953

LT COL George M. Thorpe, U. S. Army, and 1ST LT Ronald C. Meteiver, U. S. Army, for Appellant.

LT COL Thayer Chapman, U. S. Army, LT COL Paul J. Leahy, U. S. Army, LT COL William R. Ward, U. S. Army, and 1ST LT Martin Blackman, U. S. Army, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

On the basis of facts hereafter recited, a general court-martial, convened at Camp Chitose Number 1, Chitose, Japan, convicted the petitioner, Weems, of involuntary manslaughter, the offense defined by Article 119(b)(2), Uniform Code of Military Justice, 50 USC § 713. The sentence adjudged by the court was dishonorable discharge, total forfeitures, and confinement at hard labor for one year. The convening authority approved the conviction and the sentence, but suspended the latter for one year, at which time, unless sooner vacated, it is to be remitted without further action. A board of review in the office of The Judge Advocate General, United States Army, has affirmed. Further review was granted by this Court for consideration of the following two questions:

"1. Whether the evidence is sufficient to sustain the finding of guilty.

"2. Whether the instructions of the law officer were sufficient."

II

The evidence adduced at the trial— most of which necessarily came from petitioner—amounted in substance to this. Prior to the events with which we are concerned here, Weems knew the deceased, a Sergeant Gannon, by sight but not by name. On the evening of April 6, 1952, he and Gannon, at the suggestion of the latter, left the Noncommissioned Officers' Club at Camp Chitose Number 2 en route to their barracks. As they reached an open area along their path, the deceased made homosexual advances toward petitioner. The latter demanded of the Sergeant his name, and stated that he proposed to report him to the proper authorities. Gannon thereupon struck Weems on the nose with his fist. The battery was partially blocked by the petitioner, who retaliated with three blows of his own in quick succession to Gannon's face. After the first, Gannon staggered back; at the second, he began to fall; and the third was struck as he was nearing the ground. The petitioner then proceeded on his way, and it was not until sometime later that he learned that he had killed Gannon. A medical expert witness testified that the cause of death was "asphyxiation due to aspiration of

470

blood which had hemorrhaged due to the fractures of the jaw." This same witness gave it as his opinion that a blow to the jaw would not normally cause such severe harm. He also stated that the injury inflicted in this case would not ordinarily cause death, and that the fatality here was due to "surrounding circumstances"—that is, to the position in which the accused fell, and the impairment of reflexes through alcoholic intoxication.

## III

Clearly the facts here offer no indication of an intent to kill or to inflict great bodily harm. Consequently, the most serious degree of homicide in which petitioner conceivably may be guilty is that in which he was charged and of which he stands convicted: involuntary manslaughter committed in the perpetration of a battery, as denounced by Article 119(b)(2) of the Code, supra. Since it is uncontradicted that the acts of petitioner produced the death of the deceased, and since it is also undisputed that he did not intend such a result, our first and principal question from the standpoint of legal sufficiency must be one of whether Weems, in striking his victim, was engaged in the commission of a criminal battery. To put the inquiry otherwise, if Gannon had not met his death as a result of the encounter, would petitioner have been amenable to punishment for crime?

Not every striking of another constitutes a criminal battery. Of course, the striking must have been unlawful. "It must be done without legal justification or excuse . . . and without the lawful consent of the person affected. With respect to the excuse of self-defense, a person may meet force with a like degree of force, except that he may use force likely to result in grievous bodily harm only when retreat is not reasonably possible or would apparently endanger his safety, or when he is in his own home or at a place of duty where he is required to remain." Manual for Courts-Martial, United States, 1951, paragraph 207a. See also Clark and Marshall, Crimes (4th ed, Kearney) § 206; 1 Wharton's Criminal Law (12th

ed, Ruppenthal) § 826. The evidence here shows that the deceased struck the initial blow, and was himself guilty of a battery committed on the person of petitioner. The latter was, therefore, justified in repelling force with force—but was bound in law to respond "with a like degree of force." Manual, supra, paragraph 207a.

In this respect, the evidence indicates that petitioner struck deceased in the face with his right fist three times, the third blow being struck as his adversary was falling to the ground. In seeking to evaluate the extent of the force utilized by the accused, a comparison in physical size of the two men is not without probative value, and doubtless was not without effect on the court-martial. The deceased was a small man, some 5 feet 6 inches tall and weighing approximately 125 pounds. Accused, on the other hand, stands 5 feet 11 inches in height and weighs 165 pounds. Moreover, it is to be noted that the latter was experienced as an amateur tournament boxer. There was no evidence that deceased had previously exhibited proficiency in this area.

On the basis of the facts recounted earlier, it may be said with reasonable certainty that the delivery of the first blow by the deceased—following his indecent proposal—warranted in law retaliation by petitioner for his own protection. Therefore, Weems' initial battery, at least, was in all probability either justifiable or excusable. However, as petitioner himself related from the witness stand, the deceased stepped—or staggered—back after having been struck once by the former. Petitioner then struck a further blow, and, as the victim was in the act of falling, battered him yet a third time. Taking into account (1) the circumstances of each successive blow, (2) the relative size and weight of the participants, (3) petitioner's knowledge of his own fistic versatility, and (4) the fact that the deceased at no time sought to pursue either the initial physical attack or his homosexual design, the court-martial could permissibly have concluded that Weems had utilized demonstrably more

**471**

force than was necessary under the circumstances. It follows—unless his conduct was excusable or justified—that he was guilty of involuntary manslaughter. That is to say, that he had "unlawfully kill[ed] a human being . . . (2) while perpetrating . . . an offense, other than those specified in paragraph (4) of article 118, directly affecting the person." Uniform Code, supra, Article 119(b)(2). Assuming the presence of adequate instructions, we cannot at all say that the evidence did not justify such a conclusion, nor that it was in any way insufficient to support the court's findings.

## IV

The instructions of the law officer were entirely adequate save in two possible particulars. At the ▉▉▉▉▉ ■ conclusion of the evidence, he charged appropriately on the elements of the crime alleged, as well as on those of the lesser included offenses of negligent homicide and assault and battery. He then proceeded to instruct, on excusable homicide. Here, however, he confined himself solely to the possibility of a killing to save one's own life, or to prevent great bodily harm to oneself. Quite apparently, this approach to excusable homicide was unwarranted here in that the evidence before the court in no way suggested danger in that degree of gravity to the petitioner from Gannon, and because neither the evidence, nor the Government's case, pointed in the direction of an intentional killing. Indeed, both negated such a possibility. In substantial effect, therefore, there was no instruction on excusable homicide as it may have been related to the facts of this case. Moreover, there was no instruction dealing with the possibility of a justifiable homicide.

The unquestioned testimony of the accused indicates that he delivered three blows to the head and face of his victim, each with his right fist. We have earlier indicated our belief in the excusable character of the first of these, and as well our view that the totality of them may have involved the use of excessive force and resulted in a criminal battery.

**472**

Within the framework of the evidence, however, we cannot rule out the possibility that the first blow, of itself, may have been sufficient to cause death, and that as a consequence the two subsequent thrusts wholly lacked lethal effect. Captain Cyrus, the medical officer who performed the autopsy on the body of Gannon, expressed the opinion that a single forceful impact might have produced the jaw fracture involved, although he thought it more probable that additional contact had been required to bring about this result. He also indicated that the blow which produced the fracture at the same time rendered the victim unconscious and incapable of self assistance—so that, under the highly unusual circumstances presented, the deceased was asphyxiated through the inhalation of hemorrhaged blood.

Since it is possible—factually speaking—that the deceased may have been slain by the initial blow, ▉▉▉▉▉ ■ and since that first thrust may have been a "lawful act" done "in a lawful manner," we are confronted by the words of paragraph 197c of the Manual, supra, providing that a "homicide which is the result of an accident or misadventure in doing a lawful act in a lawful manner" is excusable. Thus—the argument would run—the fatal result, extraordinary in nature as it was, and wholly unintended and unanticipated by petitioner, would constitute "accident or misadventure," within the meaning of the mentioned Manual language.

It appears, therefore, that one construction of the recorded evidence would lead to the conclusion that the death of Gannon may have been caused by conduct which was within the cloak of immunity provided by the theory of excusable homicide and the right "to meet force with a like degree of force." Manual, supra, paragraph 207a. The words of Article 119 of the Code, supra, proscribe, and those of the specification have reference to, the offense of involuntary manslaughter in a situation where the accused "unlawfully kills a human being . . . while perpetrating . . . an offense . . . directly affecting the person." Under this view, of course,

the victim would not have been killed "unlawfully." Moreover, if not connected causally with the two latter blows—those which would constitute any offense of battery possibly chargeable against the accused—in no wise was the fatality produced by the "perpetration" of an offense directly affecting the person. Yet under another interpretation of the evidence, the killing may have been so connected with the two latter blows. Consequently, under this interpretation, the death of Gannon *did* result from the perpetration of a battery—that is, it was produced by the later, and not by the earlier, portion of petitioner's pugilistic action.

A possible barrier to analysis of this nature, of course, consists in the fact that temporally the three blows were connected closely and were, in a real sense, parts of a single transaction. Nonetheless, it cannot be denied that, under one entirely permissible interpretation of the circumstances established through petitioner's unchallenged testimony, he should have been acquitted. Therefore, as in the case of other affirmative defenses, the accused, Weems, was doubtless entitled to demand that the court-martial be instructed concerning the excusable quality of the consequences of a proper meeting of force with force, and related matters. In this manner—and only so, it would seem—could the court have before it every alternative for assessment of petitioner's criminal responsibility. Although we regard the present case as one of borderline status in this respect, due consideration for the rights of an accused person requires that we resolve doubts in Weems' favor here, and conclude that an appropriate instruction on excusable homicide, and the propriety of meeting "force with a like degree of force" was demanded. No such charge was furnished the members of the court-martial. Instead the law officer instructed as follows:

> "With reference to the issue of self-defense which has been raised by the defense with respect to the offense of manslaughter, the court is advised that the accused is excused for killing in self-defense if he believed on reasonable grounds that

killing was necessary to save his own life or to prevent great bodily harm to himself. To be excused for killing in self-defense a person must have believed on reasonable grounds that the danger of being killed himself or of receiving great bodily harm was imminent and no necessity will exist until the person, if he is not in his own house or at a place where he has a duty to remain has retreated as far as he safely can."

This language, of course, compounded the error. It is clear that it requires consideration of two elements which have no relevance whatever to the facts of the instant case. One of these is a belief by the accused, based on reasonable grounds, that the killing was necessary to save his own life, or to prevent great bodily harm to himself. The other demands the finding of a retreat by him in so far as it might be accomplished in safety. By predicating the defense of excusable homicide on these two factors, the law officer failed to discriminate between the law of homicide governing intentional killing in self-defense, on the one hand, and on the other, the principles controlling the right to repel force with equal force in cases of assault and battery.

It is conceded that the petitioner did not at all intend to kill, nor did he make any sort of attempt to retreat. Here, therefore, the law officer furnished the court-martial with an erroneous formula, which assumed that the accused was defending on a theory, which was not relied on, and was wholly unsupported by evidence. Moreover, it tended to force court members to find against the accused because of the want of such evidence. While the impact of the inappropriate instruction cannot be measured with exactness, it is inescapable that it operated to produce more than a fair risk of prejudice to petitioner.

### V

We perceive no error in the omission of the law officer to instruct that the accused might justifiably have used force "to prevent the commission of an offense attempted by force or surprise." There was simply no basis in evidence

for the notion that he acted to prevent the commission of such a crime, and no likelihood that one was about to be committed. After Gannon's original homosexual advance, no further step in this direction was taken by him, and Weems recognized that there was no possibility of felonious activity of this nature. At page 70 of the record, the latter stated explicitly that he did not know when he struck him whether Gannon was attempting to force him to commit sodomy, but that he did not believe that the Sergeant could compel him to engage in such an act.

The only reasonable construction of the evidence seems to be that the deceased, upon receiving petitioner's rebuff, became annoyed and struck him. Thereafter, the latter, being provoked by the earlier revolting proposal, and disturbed by the blow to his nose, retaliated in kind. Accordingly, we conclude that the possible existence of justification on this theory was not reasonably raised by the evidence, and that no burden to instruct thereon rested on the law officer.

For the reasons developed in Part IV of this opinion, the decision of the board of review is reversed and a rehearing is ordered.

Chief Judge QUINN and Judge LATIMER concur.