UNITED STATES, Appellee

v

ALVIN JACKSON, Private, U. S. Army, Appellant

15 USCMA 603, 36 CMR 101

No. 18,646

January 28, 1966

*First Lieutenant Paul V. Melodia* argued the cause for Appellant, Accused. With him on the brief were *Colonel Joseph L. Chalk, Lieutenant Colonel Martin S. Drucker,* and *Captain J. Philip Johnson.*

*Captain John D. Jackson* argued the cause for Appellee, United States. With him on the brief were *Colonel Joseph J. Crimmins, Colonel Edwin G. Schuck, Lieutenant Colonel Francis M. Cooper,* and *Captain John C. Cortesio, Jr.*

## Opinion of the Court

QUINN, Chief Judge:

The accused was tried before a general court-martial on a charge of murder, but was convicted of voluntary manslaughter, in violation of Article 119, Uniform Code of Military Justice, 10 USC § 919. As approved on intermediate review, the sentence includes a dishonorable discharge and confinement at hard labor for three years. In this Court the accused challenges the law officer's instructions on the law of self-defense. Proper consideration of the issue requires a statement of the material evidence.

Private First Class Thomas E. Perez and the accused occupied the same barracks. The accused lived on the upper floor; Perez was downstairs. Perez was twenty-three years of age, and about five feet eleven inches tall. His weight does not appear specifically, but photographs of his body, admitted in evidence, indicate he was slender or of medium build. A witness described Perez as "Maybe a little taller" than the accused. No direct evidence of the accused's age and weight was introduced on the merits, but, as we shall point out later, the court-martial was invited to consider these factors as it judged them to be from the accused's appearance and civilian defense counsel's frequent reference to him as a "young man" or "young boy."[1]

At about 6:00 a.m., on October 6, 1964, the accused passed Perez' bunk on his way to the back door of the barracks. Perez addressed him in "harsh" or "pugnacious" terms. According to a defense witness, the words were "in a sense" threatening, but the witness did not know "what the threat was." The remarks were apparently prompted by the accused's comments the previous night, which Perez said had "really provoked" him. The two had had "a few minor arguments" but the witness who testified to these would not describe the relationship between them as "actually . . . trouble." Jackson continued to the doorway; Perez followed. Outside the door, Perez pushed Jackson to the right, causing him to fall off the entranceway platform to the grass, a distance of about three feet. The accused fell to his knees. He got up and faced Perez, who came down from the porch. Perez was unarmed, but the accused took a knife from his pocket and bared the blade, which was about four and one-half inches in length. Private Robert Holmes called to the accused that "if he was going to fight the man," he should put the "knife down and fight him fair." Specialist Kenneth N. Wooldridge, a bystander, heard the accused say "I'm going to kill both of you." He appeared to be addressing Perez and Holmes. Nevertheless the confrontation ended abruptly, without injury to the parties. Perez returned to the barracks, while the accused went to the mess hall.

Within minutes after the barracks incident, Perez entered the mess hall. He sat down at a table near the ac-

---

[1] In fact, the accused was twenty-four years of age.

604

cused, but there is no evidence that he said anything to him. The accused asked Private David Bazile, seated at an adjoining table, to tell Perez to leave him alone. Bazile passed the request to Perez. In response, Perez remarked that the accused "had pulled a knife on him"; whereupon Bazile "ignored the rest of it" and concentrated on finishing his breakfast.

Perez and the accused finished eating "about the same time." With his tray, the accused proceeded to the tray room at the rear door. It appears that Perez went "in pursuit" of the accused, who seemed "nervous and looked scared." The accused turned to Perez and told him "he didn't want to fight him." Either then, or moments later, the accused walked over to a Sergeant George E. DeBose and asked him to tell Perez to leave him alone. The Sergeant called to Perez, who sat down beside him. The accused stood nearby. He took the knife out of his pocket; opened it behind his back; held it for a while, then returned it, closed, to his pocket.

After talking to DeBose, Perez went to the rear exit, and sat by the door. He appeared to be "looking straight down" the aisle at the accused. The accused went to a table occupied by noncommissioned officers. Addressing a Sergeant Buck, he told him someone was "trying to pick a fight with him and he didn't want to fight." Buck told the accused to get a noncommissioned officer from his own company. Sergeant First Class Clyde M. Reppond, one of the noncommissioned officers of the accused's organization was present at the table, but was unrecognized by the accused. Sergeant Reppond asked the accused "who was giving him trouble." The accused pointed to Perez and said Perez "wouldn't let him out the door." Sergeant Reppond went down the aisle toward Perez; the accused followed carrying his tray. What occurred next is described by Sergeant Reppond as follows:

". . . I walked directly to Perez who was sitting beside the door in a chair and I asked him what the trouble was and why he wouldn't let this man out the door and Perez told

me that 'Sarge,' said, 'he's got a blade in his pocket about this long'. He indicated approximately ten inches, and I turned from Perez—

"Q Who was making that statement? Perez?

"A Perez was making the statement to me. So I turned from Perez to Jackson and Jackson had followed behind me from the table where I talked to him down to where Perez was. I turned to Jackson and told him, 'Jackson, give me the knife' and about the time I said that, Perez reached past my head or left shoulder and struck at Jackson. He didn't make a real solid blow. He had an open hand. Well, later on, I noticed a small skinned place on Jackson's lip where the skin was broken and I belive this was caused from that blow, probably the fingernail, but from then on the movements were so fast—well, I started to step between them. I was going to separate them, tell them to break it up. Well, I saw the knife in Jackson's hand at that time, so I did not go between them and I was kinda dumbfounded and I stood back and didn't know exactly what to do.

. . . . .

"A It all happened so fast that actually when I first saw the knife it was as I started to walk between them and said, 'break it up', but I did not get between them because I saw the knife and at the time I saw it, Jackson was in a bending forward position and the knife was low. By low, I mean, well, below the height of his knee."

Other witnesses testified that before Perez and the accused "came together," the accused removed the knife from his pocket, and opened it. The witness most favorable to the accused said the knife was removed before the "clinch," but was not opened until the two were "hugging" each other. There was general agreement among the witnesses that after the accused and Perez were "hugged together" for about three or four minutes, they became "slightly separated," when Perez fell or came up against the mess hall wall. In that

**605**

moment of separation, the accused stabbed Perez three times in the groin. Private Holmes and another bystander seized the accused, and "picked him up clear of the floor." Perez slumped into a chair, and "just looked into space." Private Holmes remarked to the accused, "You're going to jail for this." The accused replied, "Yeah, he hit me in the face." The accused then left the mess hall. He next appeared at the orderly room of his unit, apparently within minutes of leaving the mess hall. He "stuck his head in at the door and said he'd just stabbed a . . . [using a particularly offensive obscenity]"; and immediately "took off."

Emergency aid was administered to Perez at the mess hall by a medical corpsman. Perez was then taken to the hospital in an ambulance. From the nature of the wound and the loss of blood, a medical doctor concluded Perez had a severed femoral artery or vein. As he attempted to reestablish a circulatory route for the blood, Perez died. An autopsy confirmed that stab wounds had "completely severed" the left femoral artery, and partially severed the left femoral vein. Death was attributed to hemorrhage resulting from the wounds.

Two questions are actually present in the attack on the correctness of the instructions on self-defense. The first is whether the record of trial contains sufficient evidence to require the instructions. United States v Green, 13 USCMA 545, 33 CMR 77; United States v Regalado, 13 USCMA 480, 33 CMR 12. The second issue is whether the instructions were sufficiently correct, in both principle and clarity, to provide meaningful legal guidelines so the court members could properly determine the accused's guilt or innocence. Although the form of the appeal may raise only the second of the two questions, we are not precluded thereby from considering the first. United States v Green, supra. Here, however, the law officer and all counsel concluded that self-defense was properly in issue. We are reluctant to disregard their assessment. United States v Andrews, 15 USCMA 514, 36 CMR 12. Accordingly, we turn directly to the instructions.

An out-of-court hearing was held on proposed instructions. Defense counsel submitted a five-page request, which he said was composed of statements gleaned from "various cases" and instruction form books in use in the State courts of Missouri and Georgia. The law officer adjourned the hearing to study the defense statement. On resumption of the hearing, the law officer presented revised instructions. After further discussion, both of the accused's lawyers, military and civilian, and trial counsel approved the final draft of the law officer's proposed instructions. Nevertheless, in their respective arguments they disagreed as to the law.

Civilian defense counsel opened his phase of the argument with a description of the accused as "a young boy . . . away from home." Coming to the issue of self-defense, he referred to the "frame of mind" of "this boy," and argued that in assessing the accused's *action* the court members should not consider what they "would have thought" at the time, but what was "in this boy's mind." Trial counsel interrupted to object that counsel was misstating the law. Before the law officer ruled on the objection, defense counsel said, "All right," and continued with his argument that the proper test was not what a "reasonable man would think at all times," but what he "would think under the circumstances that might be in that boy's mind." When trial counsel took up the argument, civilian defense counsel interposed an objection of his own. He contended trial counsel was arguing that the test of self-defense was what "a reasonable man [would do] and not the condition of this boy's mind." The law officer did not rule on the objection. Instead, he commented as follows:

"Both sides . . . [have] gone into that. I think the defense . . . misquoted it some too. Let me say at this time, [i]t is what a reasonable person would do under the particular circumstances. When we say a reasonable person, we consider the age of the accused, a soldier of his status, what would he do. It's not what would some six foot three per-

son do, or what you might do. It's what a reasonable person in his status considering his age and what you've seen of him and the like. It's what is reasonable under the circumstances. You may continue."

Trial counsel concluded his argument without further objection; and the law officer took up the formal instructions to the court-martial. He began by advising the court it was his duty to instruct on the law, and it was the court's duty to apply that law to the facts, as determined by it. In material part, the instructions on self-defense are as follows:

". . . The accused is excused from killing in self-defense if he believes on reasonable grounds that the use of such force is necessary to prevent great bodily harm to himself and that the danger of receiving great bodily harm is imminent.

"In defending himself against the unlawful attack of another, a person is justified in resorting to the use of a deadly weapon to repel an unarmed assault if the particular circumstances of the case require such use for his protection from great bodily harm. In considering whether the force used against the victim was reasonable you should consider all the facts and circumstances as they appeared at the time of the alleged stabbing. The question is, did the accused act in a manner which was reasonable under the circumstances and in the situation which confronted him at the time.

"As I previously said to you, the standard for the reasonable man is what would a soldier of the accused's age and status do under those circumstances. That is, a reasonable soldier. What would he do under— not reasonable soldier—what would be reasonable under those particular circumstances.

"The burden is on the prosecution to establish the guilt of the accused beyond a reasonable doubt. As I said before, self-defense is a complete defense to the offense charged and the lesser included offense. Consequently, unless you are satisfied by —beyond a reasonable doubt that the accused did not act in self-defense, you must find the accused not guilty of the charge, also the lesser included offense."

At the end of the instructions, no objections were registered by either party, and no requests were made for additional instructions. However, the president of the court-martial made some remarks on the instructions. These, and the colloquy which followed, are quoted below:

"PRES I have a question. In the summation here several times there's been brought out reasonableness of the act by Jackson, his age and his training and so on must be considered. We have nothing to base— to decide about his age and training other than what he looks like.

"LO It's not what's in the thought of the mind. It's what a reasonable person under those circumstances, how he would react. So take the average soldier of the age and rank of the accused and determine what is reasonable under those circumstances and that is all there is for you to do, gentlemen. There's nothing else that we can go into. Any objection to that explanation?

"CDC No sir, the court expressed it so well the first time, the difference between the mature man—

"LO It's what an individual of the accused's age, what a soldier under those circumstances, how he would act reasonably. Anything further, gentlemen? The court then will be closed."

Appellate defense counsel contend the instructions erroneously required the court members to determine the issue of self-defense on the basis of what a hypothetically reasonable man would have done in the same circumstances, whereas they should have been instructed "to place themselves in the shoes of the accused and from his vantage point ascertain whether he had a reasonable basis for his actions."

In United States v Acosta-Vargas, 13 USCMA 388, 392, 32 CMR 388, we reviewed the principle of self-defense

as legal excuse for an act which would otherwise be criminal. Commenting on the exposition of the principle in judicial opinions and by various text writers, we said:

". . . With marked unanimity we find the rule to be stated, substantially, that the force to which one may resort in self-defense is that which he believes on reasonable grounds to be necessary, in view of all the circumstances of the case, to prevent impending injury."

We again summarized the general rule in United States v Regalado, supra, at page 484, when we observed that:

". . . While 'detached reflection' is not demanded under pressure or in a fast moving situation, one must in fact, and on reasonable grounds, fear imminent death or serious injury before he is entitled to resort to a dangerous weapon."

These, and similar cases, indicate the defense is composed of two elements. First, the surrounding circumstances must show the existence of reasonable grounds to apprehend that death or grievous bodily harm is likely to be inflicted upon the accused; and, secondly, it must appear the accused believes the force he used against another, that is, the force which is the basis of the charge against him, was necessary to protect himself against death or serious bodily harm.

The law does not demand the impossible or the unattainable. Consequently, in determining the existence of reasonable grounds to anticipate danger, certain factors relating to the accused are considered. For example, to a child or a female a particular situation may present reasonable grounds to apprehend danger, but the same circumstances may not make an adult male apprehensive of death or serious injury. If there is no evidence of a special factor which the law or common experience recognizes as affecting the reasonableness of the apprehension of danger, the test, for this element of the defense, is whether, considering all the circumstances, a reasonable, prudent person would believe there was ground to fear death or grievous bodily harm. In that situation, it is immaterial whether the accused is twenty-four years of age or forty years of age; the determination of the existence of reasonable grounds to apprehend danger is made from the viewpoint of an adult male. This aspect of the defense, therefore, is objective in nature.

Different considerations obtain in the second element of the defense. This element is personal to the accused. It is what he believes. His inexperience, his lack of education, his emotion control, all are relevant to whether he believed it was necessary for his protection to use the degree of force he used. Here, one can speak of looking at the situation "through the eyes of the accused." See United States v Moore, 15 USCMA 187, 195, 35 CMR 159; dissenting opinion, Judge Ferguson, in United States v Green, supra, at page 553. At the time of the stabbing, the accused was twenty-four years of age; older in fact than Perez. As we pointed out earlier, no direct evidence of his age was introduced. However, defense counsel's frequent references to the accused amounted to an invitation to the court to inspect the accused's physical appearance to determine his age and apparent inexperience, even though he did not testify as a witness. See State v Dorathy, 132 Maine 291, 170 Atl 506 (1934); United States v Day, 54 F2d 990 (CA2d Cir) (1932). In the eyes of the law, the accused was an adult. Since there was no evidence to the contrary, he presumably was of sufficient intelligence to act as an ordinary prudent person. Consequently, there were no special factors to qualify the ordinary standard by which to determine the existence of reasonable grounds to fear death or grievous bodily harm; that is, this aspect of the defense was to be determined on the basis of whether, considering all the circumstances, a reasonable, prudent person would conclude that Perez' attack provided grounds to fear that the accused faced death or grievous bodily harm. How-

608

ever, the special attributes of the accused could be considered in determining whether he believed he had to stab Perez to save himself. With this understanding of the different effect the personal qualities of the accused may have upon each branch of the defense of self-defense, we consider how the law officer treated them in the instructions.

The first reference to self-defense is in the law officer's comments on civilian defense counsel's objection ██ to trial counsel's argument. The point of the argument to which objection was made dealt with the accused's *reaction* to Perez' assault. That was also the subject of the law officer's comments. What the accused did is relevant only to his belief in the necessity of the force he used. For that purpose, the court members may, as we have indicated, consider all the personal qualities of the accused in evidence. Consequently, it was improper to refer to "what a reasonable person would do under the particular circumstances." Had the instruction stopped there, we would need to assess its effect; but it does not stand by itself. The remainder of the law officer's comments stressed that the reasonable person was in fact one possessing the special qualities of the accused, "his age and what you've seen of him." Thus, even if the comments are construed as instructions, read in their entirety, they were not wrong. Perhaps they could have been better phrased; but inartful language does not justify reversal, if there is no fair risk the court-martial was misled to the accused's prejudice. See United States v Smith, 8 USCMA 582, 584, 25 CMR 86. We perceive no such risk here.

The second reference to self-defense appears in the formal instructions. The first sentence, as quoted above, is an unimpeachable paraphrase of the general rule set out in decided cases. United States v Acosta-Vargas, and United States v Regalado, both supra. Similarly, the first sentence of the next paragraph is unassailable. The rest of the paragraph supplies the basis of the accused's assignment of error. Again, there is general reference to the belief

of a reasonable person in the necessity for using a knife under the circumstances, but the real meaning is made plain by the law officer's definition of "reasonable man." The definition left no doubt that the standard by which to judge the accused's belief as to the necessity for using the knife was not the judgment of a person of ordinary prudence and intelligence, but that of one having the individual qualities of the accused. As a whole, therefore, the instructions required the court-martial to consider the accused's attributes in determining whether he believed his use of the knife was necessary to protect himself against serious injury. Apparently, accused's counsel at trial construed the instructions in that light. Thus, in the discussion on the president's question as to the evidence of the accused's age, he observed that the formal instructions had "expressed it [the rule] so well." Similarly, there is no indication the president was confused. He was merely troubled by the absence of direct evidence of accused's "age and his training and so on"; and he just wanted to know whether these factors were to be ascertained by the court members on the basis of what the accused "looks like." We find no ambiguity in the formal instructions which presented a fair risk of prejudice to the accused.

Finally, we consider the law officer's comments during the colloquy on the president's remarks. Once again, the substance of the law officer's instructions was that the court members were to determine the accused's response to the situation in light of all the circumstances that applied to him as an individual. Certainly, the law officer could have answered the president's question more to the point, but his explanation, in its entirety, did not set out a standard different from, or inconsistent with, that prescribed by law and delineated in the formal instructions.

The decision of the board of review is affirmed.

KILDAY, Judge (concurring):

I concur.

In my view, the issue of self-defense

is reasonably raised by the evidence here. The law officer, therefore, correctly undertook to instruct the court members thereon, in order that they might consider and resolve that contested question in deliberating on accused's innocence or guilt.

The governing principles of self-defense, as I perceive them, are delineated by our prior opinions. In homicide cases, two essential elements are involved. The first element requires that the accused honestly and reasonably believe he is in danger of death or serious bodily injury. This is a purely objective test. The second consideration is subjective in nature. The accused is entitled to use such force in self-defense as he believes on reasonable grounds to be necessary.

The law of self-defense and its two elements are expounded and illuminated in the following decisions of this Court. See United States v Acosta-Vargas, 13 USCMA 388, 32 CMR 388; United States v Smith, 13 USCMA 471, 33 CMR 3; United States v Regalado, 13 USCMA 480, 33 CMR 12; United States v Green, 13 USCMA 545, 33 CMR 77; United States v Gordon, 14 USCMA 314, 34 CMR 94; United States v Campbell, 14 USCMA 383, 34 CMR 163; United States v Judkins, 14 USCMA 452, 34 CMR 232. See also United States v Brown, 13 USCMA 485, 33 CMR 17; United States v Hayden, 13 USCMA 497, 33 CMR 29; United States v Duckworth, 13 USCMA 515, 33 CMR 47; United States v Campbell, 13 USCMA 531, 33 CMR 63; United States v Hubbard, 13 USCMA 652, 33 CMR 184.

Careful consideration of the record in the instant case leaves me with the conviction that the instructions by the law officer on both elements of self-defense, though not ideal, are, when all considered together, sufficient. Moreover, I note that defense counsel at trial affirmatively expressed their satisfaction with the law officer's advice.

FERGUSON, Judge (dissenting):

I dissent.

Apparently, about the only common ground which we all find in this case is the fact that self-defense is in issue. However, one point should be made crystal clear in order to avoid confusion in the field and prevent instructional imbroglios in the future concerning self-defense, and that is that we all are in agreement on the applicable law and find it to be as follows:

a. In order to excuse a homicide, one must believe on honest and reasonable grounds that his life is endangered or he is about to suffer grievous bodily harm at the hands of his assailant.

b. Believing such, the accused is entitled to use such force as *he* believes necessary to repel the attack and may, therefore, kill his assailant if he honestly thinks such is required. In this connection, and given the predicate of honest and reasonable belief that his life was in danger or he was about to suffer grievous bodily harm, the accused is *not* objectively limited to the use of reasonable force. In short, any differences we have are semantical, not conceptual.

Beyond this, I cannot join with my brothers, for I believe they incorrectly construe the law officer's instructions when they find he did not inform the court erroneously that the accused was limited to the force which a reasonable person might use. Insofar as I can determine, any differentiation between their opinions and my own view is based upon the application of the law to the facts in interpreting the law officer's instructions. Here is the nub of our disagreement, and I must frankly confess my inability to rationalize, as do my brothers, that an instruction which so repeatedly refers to "whether the force . . . was reasonable," "did the accused act in a manner which was reasonable," "the standard for the reasonable man," "a reasonable soldier," "what would be reasonable," the "reasonableness of the act by Jackson," and "how he would act reasonably" may be construed as not limiting him, in defiance of applicable law to the use of reasonable force. That is just not a fair construction of the advice. Accordingly, I record my disagreement and the reasons therefor. In so doing, however, I invite law offi-

cers to avoid error in the future by application of the two parts of the test of self-defense which we all set out rather than depend upon terms which may mislead the jury into believing that accused's reaction, on the basis of honest and reasonable fear for his life, is to be measured by a purely objective standard.

Tried by a general court-martial convened at Fort Chaffee, Arkansas, the accused was arraigned upon a charge of unpremeditated murder, in violation of Uniform Code of Military Justice, Article 118, 10 USC § 918, and found guilty of voluntary manslaughter, in violation of Code, supra, Article 119, 10 USC § 919. He was sentenced to dishonorable discharge, forfeiture of all pay and allowances, confinement at hard labor for five years, and reduction. The convening authority approved the sentence, and the board of review affirmed, reducing the period of confinement to three years. Thereafter, we granted accused's petition for review upon the issue whether:

"THE LAW OFFICER ERRED TO THE SUBSTANTIAL PREJUDICE OF THE ACCUSED IN HIS INSTRUCTIONS TO THE COURT-MARTIAL UPON THE ISSUE OF SELF-DEFENSE, IN THAT:

A. THE ACCUSED'S DEFENSE IS MEASURED BY THE STANDARDS OF THE REASONABLE MAN OR THE 'REASONABLE SOLDIER' (R. 253, 258–9, 265)."

The law officer below treated the evidence as placing self-defense in issue and overruled an objection by the trial counsel to instructing thereon. While the United States does not contend such ruling was in any manner incorrect, the evidence should nevertheless be detailed and, when examined, demonstrates the question was clearly presented for the decision of the court members. Thus, the transcript indicates the following circumstances.

## I

During the early morning hours of October 6, 1964, Private Tony Diaz was cleaning up the area around his bunk in the 1st Ordnance Company Barracks at Fort Chaffee. Private Jackson had also entered the barracks to clean up his area. He showed Diaz a knife. It had a white handle, and the blade was approximately five inches in length. Diaz described the instrument as a "watermelon" knife, used "to sample watermelons with." He told Jackson "to get rid of it, put it away because he would get in trouble with it, because of the length of it." Jackson returned to his area.

Private Holmes saw Jackson come down the steps from his quarters and walk "straight on through the barracks." Private Perez, the eventual victim, remarked "that Jackson had been all over his table the night before." Jackson "looked back in the barracks and asked Perez what he said." Holmes paid no further attention until he "heard a loud noise, sounded like a door hit the barracks or something." He went outside and saw Jackson, on the ground, facing Perez, with a knife in his hand. He told Jackson to put down the knife and fight "fair." He added "a statement that if it was me I'd pick up a bottle and protect myself." Jackson "told Perez to leave him alone" and "just sort of turned and walked away and went to the Mess Hall and Perez came back in the barracks." During the incident with the knife, Perez was advancing on Jackson, and Jackson was backing away, telling him to leave him alone. Holmes did not hear Jackson voice any threats.

According to Private Ware, as Jackson left the barracks, Perez "made some harsh remarks to him, some threatening remarks." Perez declared "he was going to do something to him." These were "pugnacious remarks and as I said, in a sense he threatened him. As to what the threat was, I don't know, and after these words were exchanged," Perez proceeded to the stoop outside the door. He shoved Jackson off onto the ground, a drop of some three feet. Jackson fell and, as he arose, Perez began to advance upon him. Jackson produced his knife, and began to retreat. Jackson eventually turned away and walked toward the mess hall.

Specialist Wooldridge saw the incident outside the barracks while en route to the mess hall. Holmes, Perez, and

**611**

Jackson were arguing. He heard Jackson say, " 'I'm going to kill both of you.' " Perez was advancing on Jackson, and Jackson was backing up. He told Perez and Holmes to leave him alone and turned to follow Wooldridge to the mess hall. While Wooldridge "wouldn't actually call it trouble," he knew Perez and Jackson previously "had a few minor arguments." He had never seen Jackson with a knife before.

Once in the mess hall, accused procured his breakfast and sat down to eat. Perez soon entered and sat at a nearby table. Perez apparently made some statement, and Jackson asked Private Bazile, who was sitting near him, "to tell Perez to leave him alone." Bazile complied, and Perez left, saying "something about Jackson had pulled a knife on him that morning." Jackson finished breakfast at about the same time and walked toward the rear exit of the mess hall.

Perez turned back and was observed by Specialist Walker "in pursuit of Jackson" around the mess hall. Jackson, who "seemed scared and nervous," "turned around and told Perez that he didn't want to fight him." At one time, Jackson was seen to remove a knife from his pocket, open it, close it, and return it to his pocket. He walked up to a table and asked Sergeant DeBose "to ask Perez to leave him alone." Perez nevertheless "was still in pursuit of Jackson and Jackson went to his left around two tables to get away from Perez." DeBose then stopped Perez, and "said a few words to him," while Jackson went toward the back of the mess hall.

After talking with DeBose, Perez again interrupted Jackson before he could dispose of his breakfast tray, and blocked the mess hall exit, initially by standing at the door and thereafter by sitting by it. Jackson once more went back and sought aid from noncommissioned officers.

A specialist was heard by Walker to tell Jackson, who was again asking for assistance, " 'If you're going to get your ———— killed, don't bother me with it.' " Accused then tried to obtain relief from Sergeant Major Buck, who

**612**

told him to seek out a noncommissioned officer from his own company. Sergeant Reppond, assigned to accused's organization, overheard Jackson's request, and asked the nature of his difficulty. Jackson replied that Perez would not allow him to leave the mess hall. Reppond, followed by Jackson, "walked directly to Perez who was sitting beside the door in a chair," and asked him "what the trouble was." Perez told Reppond that Jackson " 'got a blade in his pocket about this long.' " Reppond turned to Jackson and requested the knife. As the request was made, Perez suddenly struck Jackson in the mouth. Jackson, knocked back against a table, dropped his tray. His "mouth was bloody, real bloody." Shaking with apparent nervousness, he was seen to draw his knife and open it with both hands. The parties scuffled and clenched together, with Jackson holding the knife behind Perez's back and striking him with its hilt. Perez "was hitting Jackson in the head" with "fairly good blows." Perez was striking "with his fists." The two men broke apart, and as they separated, Jackson stabbed Perez three times in the left leg with short, jabbing strokes. Perez stumbled back and sat down. Two soldiers disarmed Jackson, who left the mess hall and ran to his barracks. There, he "stuck his head in at the door" of the "Orderly Room" and informed the first sergeant "he'd just stabbed a ———— ———— and took off." From the barracks, the accused went directly to the Military Police station and surrendered.

Two of Perez's wounds were superficial. The third, which penetrated "roughly two inches," severed the femoral artery and partially cut the femoral vein. As a result of this injury, Perez died approximately forty-five minutes to one hour later.

II

There cannot be any doubt that, as the law officer found, the foregoing evidence is sufficient fairly to place in issue the question whether the accused stabbed Perez in self-defense. Of course, the court members could find otherwise, and there is evidence which might even

more strongly support such a belief on their part. At the same time, however, it was open to them to find that accused reasonably believed Perez, the taller of the two men, was vengefully bent on doing him serious bodily harm and that he could not be dissuaded from his design by any other means—even the belated intervention of his superiors, who, except for Sergeant Reppond, demonstrated an amazing indifference to their duties and responsibilities. Moreover, it can equally be found that the accused, in finally stabbing Perez, had sought by every means to avoid the controversy and finally had concluded no other route was open to him in order to avoid serious injury at Perez's hands.

Thus, it will be noted that all the evidence is capable of demonstrating Perez's aggressive determination, from the very outset, to punish the accused severely. It was he who initially threatened the accused because of some fancied slight during the preceding evening. And this naked threat was quickly translated into action when he shoved the accused off a barracks stoop, causing him to drop backwards three feet to the ground. This alone might indicate to the court that he intended no mere fisticuffs but something quite different, for all would agree his action in this regard could have well caused grievous physical harm to the accused. At the very least, it might serve as a basis for an honest and reasonable belief by Jackson that such injuries were to be visited upon him.

Moreover, Perez, despite Jackson's departure after warning his assailant off and repeatedly telling him he did not wish to engage in combat, persisted in renewing the encounter at the mess hall, pursuing him over the premises, disregarding the injunctions of his fellow soldiers, and finally determining to bring on the encounter at all costs by simply barring the exit through which he knew Jackson must pass in order to deposit his tray and leave the hall. Again, the record reflects the accused's frightened and nervous condition, his repeated efforts to avoid Perez, and his continuous appeals for protection, the need for which was again shown by the specialist's cynical observation " 'If you're going to get your ———— killed, don't bother me with it.' " Finally, having discovered a responsive noncommissioned officer, the accused saw that even that mantle against violence was of no avail, for Perez, apparently utilizing Reppond's demand on Jackson for the knife as a distraction, immediately struck him sufficiently hard to bloody his mouth and followed up with a number of "fairly good blows." Beset as he was, having earlier tasted the extent to which Perez appeared only too eager to go, having heard his threats, having been continuously pursued around the mess hall, and having finally seen Perez was even willing to defy Reppond's authority, can it be said it was not fairly open to the court-martial to find Jackson honestly and reasonably feared serious bodily injury at Perez's hands and resorted to his weapon only out of a belief such was necessary in order to defend himself? The answer from the evidence is obvious; indeed, the proof renders the question rhetorical, and, in fact, the Government does not even contend the issue is not reasonably raised. See United States v Black, 12 USCMA 571, 31 CMR 157; United States v Hubbard, 13 USCMA 652, 33 CMR 184; and United States v Carmon, 14 USCMA 103, 33 CMR 315.

### III

As self-defense was placed in issue, it is necessary, as the granted question indicates, to examine the instructions of the law officer in order to determine their accuracy. As a matter of background, it should also be noted that the trial defense counsel presented to the law officer, together with a list of pertinent citations, a written requested instruction which, in all aspects pertinent hereto, properly set forth the law regarding self-defense. The law officer refused to give the requested instruction on the ground he felt it "confusing and objectionable." In lieu thereof, he substituted his own instruction. It was only then that the defense acceded on the matter. In light of such request, in proper form, and the denial thereof, it is hardly proper now to argue the doctrine of waiver is applicable here.

**613**

The advice regarding self-defense, as actually delivered to the court, is as follows:

"Evidence has been presented in this case with respect to self-defense. Self-defense, if you so find is a complete defense to all charges and specifications to the offense charged and also to the lesser included offense of voluntary manslaughter. With respect to the question of self-defense which has been put in issue, as I said before with respect to the offense charged and the lesser included offense, you are advised that a person may utilize that force which he believes on reasonable grounds to be necessary in his self-defense. Although he may not use inordinate force so as to become the aggressor, he is not limited to the exercise of precisely identical force or degree thereof as asserted against him; rather he may employ such force or means as he believes on reasonable ground necessary for the protection against the impending harm under the circumstances. The accused is excused from killing in self-defense if he believes on reasonable grounds that the use of such force is necessary to prevent great bodily harm to himself and that the danger of receiving great bodily harm is imminent.

"In defending himself against the unlawful attack of another, a person is justified in resorting to the use of a deadly weapon to repel an unarmed assault if the particular circumstances of the case require such use for his protection from great bodily harm. In considering whether the force used against the victim was reasonable you should consider all the facts and circumstances as they appeared at the time of the alleged stabbing. The question is, did the accused act in a manner which was reasonable under the circumstances and in the situation which confronted him at the time.

"As I previously said to you, the standard for the reasonable man is what would a soldier of the accused's age and status do under those circumstances. That is, a reasonable soldier. What would he do under—not reasonable soldier—what would be reasonable under those particular circumstances.

"The burden is on the prosecution to establish the guilt of the accused beyond a reasonable doubt. As I said before, self-defense is a complete defense to the offense charged and the lesser included offense. Consequently, unless you are satisfied by—beyond a reasonable doubt that the accused did not act in self-defense, you must find the accused not guilty of the charge, also the lesser included offense."

At the conclusion of the law officer's instructions, the president made the following inquiry, and the military judge answered as appears below:

"PRES I have a question. In the summation here several times there's been brought out reasonableness of the act by Jackson, his age and his training and so on must be considered. We have nothing to base—to decide about his age and training other than what he looks like.

"LO It's not what's in the thought of the mind. It's what a reasonable person under those circumstances, how he would react. So you take the average soldier of the age and rank of the accused and determine what is reasonable under those circumstances and that is all there is for you to do, gentlemen. There's nothing else that we can go into. Any objection to that explanation?

"CDC No sir, the court expressed it so well the first time, the difference between the mature man—

"LO It's what an individual of the accused's age, what a soldier under those circumstances, how he would act reasonably. Anything further, gentlemen?"

At the outset, the instructions informed the court the accused could only use "such force or means as he believes on reasonable ground" to be necessary for his protection. It was told he might resort to use of a deadly weapon to repel an unarmed assault only "if the particular circumstances of the case re-

quire such use for his protection from great bodily harm." Then, however, the court was specifically advised:

". . . In considering *whether the force used against the victim was reasonable,* you should consider all the facts and circumstances as they appeared at the time of the alleged stabbing. *The question is, did the accused act in a manner which was reasonable under the circumstances and in the situation which confronted him at the time."* [Emphasis supplied.]

And, again, the law officer reiterated:

"As I previously said to you, the standard for the reasonable man is what would a soldier of the accused's age and status do under those circumstances. That is, a *reasonable soldier.* What would he do under— not reasonable soldier—*what would be reasonable under those particular circumstances."* [Emphasis supplied.]

Finally, when the president inquired about the standard by which to measure the "reasonableness of the act by Jackson," the law officer's reply emphasized it was "not what's in the thought of the mind," but *"a reasonable person under those circumstances, how he would react . . . an individual of the accused's age, what a soldier under those circumstances, how he would act reasonably."* (Emphasis supplied.)

It is impossible—without doing violence to the English language—to construe these instructions in any manner which avoids the conclusion that the law officer required the court to test by an objective standard both the accused's belief as to impending danger and the degree of force with which he might respond thereto. The law in homicide cases is not so strict.

As we have repeatedly noted, if an accused honestly believes, on reasonable grounds, that his life is endangered or that he is about to suffer grievous bodily harm at the hands of his assailant, he is entitled to take such measures to defend himself, *as appear to him to be necessary.* United States v Acosta-Vargas, 13 USCMA 388, 32

CMR 388; United States v Smith, 13 USCMA 471, 33 CMR 3; United States v Regalado, 13 USCMA 480, 33 CMR 12; United States v Black, supra. In *Regalado,* supra, we specifically stated, at page 484:

". . . '[D]etached reflection' is not demanded under pressure or in a fast moving situation, [but] one must in fact, and on reasonable grounds, fear imminent death or serious injury before he is entitled to resort to a dangerous weapon."

And in United States v Smith, supra, we quoted with approval the rule laid down in Brown v United States, 256 US 335, 65 L ed 961, 41 S Ct 501 (1921), that while, in order to take his assailant's life, one must honestly and reasonably believe he is in danger of losing his own or suffering serious injury, he is not limited to the degree of force which a reasonable man might use in repelling the attack, but may take those measures *he* thinks necessary to eliminate the danger to himself. Mr. Justice Holmes's succinct and illuminating language in *Brown,* supra, bears repeating:

". . . Many respectable writers agree that if a man reasonably believes that he is in immediate danger of death or grievous bodily harm from his assailant, *he may stand his ground, and that if he kills him, he has not exceeded the bounds of lawful self-defense. That has been the decision of this court.* Beard v United States, 158 US 550, 559, 39 L ed 1086, 1090, 15 Sup Ct Rep 962, 9 Am Crim Rep 324. Detached reflection cannot be demanded in the presence of an uplifted knife. Therefore, in this court, at least, *it is not a condition of immunity that one in that situation should pause to consider whether a reasonable man might not think it possible to fly with safety, or to disable his assailant rather than to kill him.* Rowe v United States, 164 US 546, 558, 41 L ed 547, 551, 17 Sup Ct Rep 172." [Emphasis supplied.]

So, also, in Rowe v United States, 164 US 546, 41 L ed 547, 17 S Ct 172 (1896), did the Supreme Court point

**615**

out, in reversing a conviction below, at page 557:

". . . Still, the court said that, under the circumstances, both parties were under a duty to use all reasonable means to avoid a collision that would lead to a deadly conflict, . . . and if the accused could have saved his life, or protected himself against great bodily harm, by inflicting a less dangerous wound than he did upon his assailant, or 'if he could have paralyzed that arm,' without doing more serious injury, the law commanded him to do so. . . . The accused was entitled, so far as his right to resist the attack was concerned, to remain where he was, and to do whatever was necessary or what he had reasonable grounds to believe at the time was necessary, to save his life or to protect himself from great bodily harm. And under the circumstances, it was error to make the case depend in whole or in part upon the inquiry whether the accused could, by stepping aside, have avoided the attack, or could have so carefully aimed his pistol as to paralyze the arm of his assailant without more seriously wounding him."

See also Lujan v United States, 209 F2d 190, 193 (CA10th Cir) (1953), approving an instruction that " 'if a person is assaulted with such fierce force and violence by another that his own life is threatened, or is in great danger of receiving great bodily harm, *then he may resort to whatever means may be necessary to repel the assault and to protect himself from great bodily harm, or in the defense of his own life.' "* (Emphasis supplied.)

In short, as we all agree, the issue of self-defense involves two very different matters. First, in order to use a deadly force against his assailant, the accused must honestly, and on reasonable grounds, fear death or serious bodily harm from the attack upon him. United States v Smith, supra; United States v Acosta-Vargas, supra; Josey v

United States, 135 F2d 809 (CA DC Cir) (1943); Lujan v United States, 209 F2d 190 (CA10th Cir) (1953). Once that predicate is established, however, the sole test of the degree of force which may be used is the accused's personal judgment and, if he deems such necessary, he may kill without exceeding the bounds of lawful self-defense. The degree of force is measured by his own assessment of the situation, and the action which a reasonable man might take plays no part in determining whether he went too far. Brown v United States, supra. He may take human life, based on his belief in the necessity therefor, if, in turn, he also honestly and reasonably fears for his life or a grievous invasion of his bodily integrity.

The law officer's instructions, however, require not only an honest and reasonable belief by Jackson that Perez was seeking either his life or to injure him seriously, but, conceding such to be present, limited Jackson's response, his "act," his "reaction," to that degree of force which might be used by a reasonable man under the circumstances. Hence, he too narrowly limited what the accused might do and made the defense turn, not upon accused's personal assessment of the action required, but upon the response of a hypothetical individual, faced with the same situation. As the Supreme Court and this Court have both said, such detached reflection is not required regarding what the accused may do, as opposed to his belief in the need for protection of his life.

A proper instruction in this case would have separated these two concepts and limited the objective standard to the question of accused's belief. Instead, it appears the law officer ignored our admonition to the contrary in United States v Smith, supra, and sought to create an instruction by lifting language from the context of our various opinions, seeking thereby to convey a proper statement of the law to the court members.[1] It is worthy

---

[1] It may also be the law officer confused the limitation upon the use of force to repel an aggressive assault where an accused merely wishes to avoid bodily harm to himself but does not reasonably fear for his life or serious bodily injury at the hands of his assailant. In such instances, the

616

of repetition that appellate discussion of legal principles is not intended to be a model for trial instructions, and we can do no better than there to lay down general guidelines, within which the law officers below are to operate. United States v Smith, supra. As this law officer erroneously strayed beyond those guidelines in this case, and as self-defense was plainly in issue, it is obvious his instructions were prejudicially erroneous.

I would reverse the decision of the board of review and remand the case for a rehearing.

---

accused is limited to the use of reasonable force to repel the assault upon him. United States v Wilson, 5 USCMA 783, 19 CMR 79; United States v Weems, 3 USCMA 469, 13 CMR 25. But, as has been set out, no such limitation on the responsive force appears, when the accused honestly and reasonably believes he will suffer death or grievous bodily harm from his attacker. It goes without saying that the distinction should be plainly made to the fact finders in appropriate cases, for the matter of how much force can be used under the two different standards is usually of intimate concern in arriving at a proper verdict. Here, however, the law officer telescoped the two instructions and thereby misled the jury into believing the accused's response was limited by law, no matter how honestly and reasonably he feared death or serious injury from Perez's assault. Cf. United States v Weems, supra.