UNITED STATES, Appellee

v

GARFIELD L. PERRY, Specialist Five,
U. S. Army, Appellant

16 USCMA 221, 36 CMR 377

No. 19,072
April 29, 1966

*Captain Beverly B. Bates* argued the cause for Appellant, Accused. With him on the brief were *Colonel Joseph L. Chalk* and *Lieutenant Colonel Jacob Hagopian.*

*Captain Michael E. Phenner* argued the cause for Appellee, United States. With him on the brief were *Colonel Joseph J. Crimmins* and *Lieutenant Colonel Francis M. Cooper.*

## Opinion of the Court

KILDAY, Judge:

Tried by general court-martial for unpremeditated murder, contrary to Article 118, Uniform Code of Military Justice, 10 USC § 918, accused pleaded not guilty. The court members, however, after hearing the evidence, convicted him of the lesser included offense of involuntary manslaughter, in violation of Article 119(b)(2) of the Code, 10 USC § 919, and sentenced accused to dishonorable discharge, total forfeitures, and confinement at hard labor for three years. The convening authority changed the form of punitive separation to bad-conduct discharge, but otherwise approved the findings and sentence. Thereafter, a board of review in the office of The Judge Advocate General of the Army affirmed accused's conviction and the penalty except that it reduced the term of confinement to two years.

Accused then petitioned this Court for grant of review, pursuant to Article 67(b)(3) of the Uniform Code, 10 USC § 867. We elected to hear his appeal in order to consider two issues pertaining to the law officer's instructions. First, it is contended that the law officer erred in the advice he gave the triers of fact on self-defense. Second, appellate defense counsel assert that the law officer erred by failing to instruct on the lesser included offense of assault and battery. A brief development of the evidence will be helpful to a determination of the case.

The following facts are undisputed. The accused and a companion, one Vannoy, were drinking in a bar in the City of Inchon, Republic of Korea. A Sergeant Corgan, the victim, was also present. An altercation involving the three men took place. A few days later, Corgan died from head injuries he sustained on the evening in question.

The prosecution's evidence tended to show that accused and Vannoy together brutally assaulted the grossly drunk victim inside the bar. The latter was struck about the head, and his head also hit the concrete floor in the course of the fight. Vannoy then took Corgan to the door, slammed him against the wall, and pushed him outside where he fell. Shortly thereafter, accused also went outside, told Corgan to follow him, then turned and punched the victim in the jaw. The blow caused him to fall and Corgan's head again struck the pavement, at which point he became comatose. Bystanders transported the victim to an Army dispensary in a taxi, and there is some evidence that in getting Corgan out of the cab, they may have dropped him from a height of about eighteen inches, hitting his head again.

Despite treatment, the victim expired four days later, from head injuries. The physician who performed the autopsy testified that the combination of blows Corgan received caused his death. He stated that it was impossible to isolate any individual blow as the specific cause; that any single contact of the victim's head with the pavement might have been responsible.

Accused took the witness stand in his own behalf, and his testimony is corroborated in certain particulars by other evidence. In his version of the incident, accused categorically denied fighting with the victim or throwing any blows whatever in the affray inside the bar. His participation was limited simply to separating Vannoy and the victim, and he succeeded. When those two began to fight, ac-

222

cused testified, he stepped between them to stop them. Corgan, however, grabbed accused's shirt, and the victim fell backward pulling accused down on him. Since Corgan was struggling and kicking, accused subdued him with a simple wrist hold, after which Corgan was escorted from the club.

Accused, in the meanwhile, returned to the bar and finished his drink. He noticed a splotch on his shirt and that a button had been torn from it when Corgan grabbed him. Therefore, accused testified, he decided to go to his company and change clothes. As he walked outside, he saw Corgan, who called him a provocative name. In irritation, "like a little kid," accused told the victim to "Come here and say that." The latter, however, stayed where he was, so accused walked off toward his unit. Down the block, accused said, someone called to him and he turned around. It was Corgan, who had followed accused and was "practically right in back of me." Accused was perturbed by the inconvenience of having to change his clothes, and told Corgan "Look what you did to my shirt." Corgan responded in vulgar terms, according to accused, and "drew back as if to hit me." Accused blocked the blow and, reacting immediately, hit Corgan, who fell backward. Accused then left, as he did not think the victim was hurt. When he subsequently heard otherwise, accused inquired after Corgan's well-being and reported the incident.

With regard to the blow he admittedly struck the victim outside the bar, accused denied it was done in anger. When asked by trial counsel on cross-examination whether he feared for his life, accused answered in the negative. He believed Corgan was going to strike him—perhaps give him a black eye—so he responded. Accused believed at the time that the punch he threw was necessary to protect himself.

Thus, accused denied any complicity whatever as to any injury the victim suffered inside the bar. He frankly admitted throwing a single punch out-side in the street, but claimed to have struck Corgan at that time only because the latter was attacking him.

The law officer, in his instructions to the court members prior to findings, gave advice on self-defense. As pertinent to our inquiry, he instructed the triers of fact that:

". . . With reference to the question of self-defense, which has been put in issue by the evidence, you are advised that *the accused is excused for killing in self-defense, if he believed on reasonable grounds that the killing was necessary to save his own life or to prevent great bodily harm to himself. To be excused for killing in self-defense, a person must have believed on reasonable grounds that the danger of being killed himself or of receiving great bodily harm was imminent.* Further, a person is not necessarily limited in self-defense to the use of force identical in amount or degree with the force asserted against him. Rather, he may meet force with an amount and degree of force which he believes on reasonable grounds to be necessary in view of all the circumstances of the case to prevent impending injury to himself. He may not however excusably use force of an amount or degree which exceeds that which he reasonably believes to be necessary.

"With respect to the possibility of retreat by the accused, you are advised—this is as relates to the law of self-defense—you are advised that a person's right to self-defense is not lost because he does not pause to consider ways of escaping imminent danger. *If a person believes on reasonable grounds that he is in immediate danger of death or grievous bodily harm from his assailant, he is not required to retreat, but may stand his ground, and use such force, even to the extent of killing his assailant, as he believes on reasonable grounds to be necessary to repel the attack, or to protect his own life, or to prevent great personal injury to himself.* The opportunity to retreat safely, and the failure to

retreat, however, are factors to be considered along with all the other evidence and circumstances of the case in determining the issue of self-defense." [Emphasis supplied.]

No instruction was given with respect to the principles of self-defense in repelling an ordinary attack.

In the usual situation, the advice given by the law officer is not incorrect in a homicide case, and appellate defense counsel do not contend otherwise. However, they do assert that, as applied to the particular facts of the case at bar, the quoted instructions were misleading and prejudicially erroneous.

In assessing this issue, it is important to bear in mind that the evidence shows, in addition to the possibility the victim was dropped while medical attention was sought, that he received blows to his head both inside the bar and, later, outside the club as well. And the expert medical testimony was to the effect that any or all of the blows might have caused Corgan's death. Likewise, it must be remembered that, although accused was prosecuted for unpremeditated murder, his theory of defense denied any intent to seriously injure Corgan. Indeed, in that connection, the court-martial by its finding determined that the victim's death resulted unintentionally from an assault and battery.

Against the backdrop of those facts, we consider the accused's claim of self-defense. As the Government observes, no such issue was raised as to accused's participation in the affray inside the club. He wholly denied complicity in that regard. See United States v Duckworth, 13 USCMA 515, 33 CMR 47; United States v Wilson, 5 USCMA 783, 19 CMR 79. The only involvement accused admitted, and the only juncture at which a claim of self-defense entered the picture, concerned the single punch accused admittedly threw outside the bar, which knocked Corgan to the pavement. It is the possibility this blow by accused constituted an assault and battery which unintentionally resulted in the vic-

tim's death, as the court-martial determined, that the issue of self-defense concerned.

Accused's claim was that he was defending against an assault Corgan was committing. From his testimony, accused was not in fear of death or grievous bodily harm, but at most of a black eye. Yet, as appellate defense counsel point out, the law officer's instructions would excuse accused from criminal responsibility for the victim's death on the basis of self-defense, only if he believed on reasonable grounds that his action in striking Corgan outside the bar was necessary in order to prevent imminent death or grievous injury.

We agree with appellate defense counsel that such an instruction was prejudicially misleading under the circumstances of the case at bar.

As this Court noted long ago, an accused need not fear death or serious injury in order to legally repel a simple fistic assault by force of similar nature. See United States v Weems, 3 USCMA 469, 13 CMR 25; see also United States v Gordon, 14 USCMA 314, 34 CMR 94; and United States v Armistead, 16 USCMA 217, 36 CMR 373, this day decided. As was noted in *Weems*, where such legitimate response unexpectedly and unintentionally results in death, no criminality attaches. This is so, as was there pointed out, for the reason that permissible self-defense against an ordinary assault would constitute a lawful act done in a lawful manner. An unintended and unanticipated death resulting therefrom is an accident or misadventure within the meaning of paragraph 197c of the Manual for Courts-Martial, United States, 1951, and is excusable. Thus, in such a case, the question to be decided is whether, had the victim not died as a result of the encounter, the accused would be amenable to punishment for assault and battery.

As we view it, such is the contention accused raised in the case at bar. Indeed, we find the *Weems* case markedly similar. There, as here, the evidence

raised the possibility of an unintentional death that may have resulted from a legitimate response to a simple assault. There, as here, the law officer in instructing on excusable homicide confined himself solely to the possibility of a killing to save one's own life, or to prevent great bodily harm to oneself. There, as here, the evidence before the court-martial in no way suggested danger of that gravity to the accused from the victim.

This Court held, in *Weems*, that there was no proper instruction on excusable homicide as it ▉ may have related to the facts of the case. We conclude the same is true in the instant case, and believe the following language from *Weems* is equally applicable here:

". . . By predicating the defense of excusable homicide on . . . [the belief that the killing was necessary to protect against death or grievous bodily harm], the law officer failed to discriminate between the law of homicide governing intentional killing in self-defense, on the one hand, and on the other, the principles controlling the right to repel force with equal force in cases of assault and battery.

". . . the law officer furnished the court-martial with an erroneous formula, which assumed that the accused was defending on a theory, which was not relied on, and was wholly unsupported by evidence. Moreover, it tended to force court members to find against the accused because of the want of such evidence. While the impact of the inappropriate instruction cannot be measured with exactness, it is inescapable that it operated to produce more than a fair risk of prejudice to petitioner." [United States v Weems, supra, at page 473.]

The staff judge advocate, in his post-trial review for the convening authority, reached a similar conclusion, but opined that the error was not prejudicial because no issue of self-defense was raised. In his estimation accused had invited mutual combat with Corgan outside the bar, and self-defense is not available to those who engage in mutual affray, or who precipitate an altercation. See United States v Green, 13 USCMA 545, 33 CMR 77.

The Government urges the same contention upon us here, but we cannot accept it. It is true— ▉ indeed accused admitted—that he challenged the victim outside the bar, in irritation at the latter's language, but accused's testimony also indicates that Corgan declined the challenge, so he turned and walked away. Accused had walked some distance down the block when he was hailed, and turned to find the victim had followed him. When accused complained about his shirt, Corgan cursed him and struck at accused. Under those circumstances, and if the court members credited accused's story, we cannot say they were bound to conclude the blow outside the bar was struck in a mutual affray.

Accordingly, we conclude the law officer erred prejudicially in his instructions on self-defense. United States v Weems, United States v Gordon, and United States v Armistead, all supra. See also United States v Smith, 13 USCMA 471, 33 CMR 3.

Because of our holding on the first issue, the findings of guilty cannot stand. It is therefore unnecessary for us to decide whether the law officer also erred by failing to instruct on a lesser included offense of assault and battery. In the interest of general guidance, however, ▉ we observe that it was undisputed the victim died of head injuries, and in absence of any question as to causal connection between the blows the victim suffered and his death, assault and battery would not be raised reasonably as a lesser included offense. See United States v Schreiber, 5 USCMA 602, 18 CMR 226. Further, under accused's theory, the only blow he admitted would have been permissible in self-defense. It would not constitute even assault and battery and he should be

acquitted entirely. In any event, the question will depend upon the evidence introduced at a rehearing, and must be decided by the law officer on that basis.

The decision of the board of review is reversed. A rehearing may be ordered.

Chief Judge QUINN and Judge FERGUSON concur.