**UNITED STATES, Appellee,**

v.

**Charles L. THOMAS, Sergeant U. S. Air Force, Appellant.**

**Dkt. No. 38,129.**
**ACM 22490.**

U. S. Court of Military Appeals.

Aug. 3, 1981.

For Appellant: *Major Wade B. Morrison* (argued); *Colonel Larry G. Stephens* (on brief).

For Appellee: *Major Robert T. Mounts* (argued); *Colonel James P. Porter* (on brief).

Opinion

FLETCHER, Judge:

Tried by general court martial, the appellant pleaded not guilty to a charge alleging unpremeditated murder, in violation of Article 118, Uniform Code of Military Justice, 10 U.S.C. § 918. After initial deliberation on findings, the court-martial returned findings of guilty of involuntary manslaughter by culpable negligence, in violation of Article 119, UCMJ, 10 U.S.C. § 919.

Then, after extensive evidence was presented in mitigation, the court-martial reconsidered its findings and returned findings of guilty of negligent homicide, in violation of Article 134, UCMJ, 10 U.S.C. § 934.[1] *See United States v. Kick,* 7 M.J. 82 (C.M.A. 1979). We granted review of this case (8 M.J. 219) to examine "[w]hether the [military judge's] instructions on excusable homicide . . . were inadequate and misleading." In view of the evidence presented to the court members, we conclude that they were.

The appellant was a security policeman. On the day prior to the shooting, he engaged, along with other spectators, in some good-natured teasing of several individuals playing basketball at the base gymnasium. His exchange with the future victim turned bitter and led to a confrontation. As the victim (210 pounds) approached, the appellant, who was on duty, dropped the gun belt which he was wearing. The victim, however, returned toward the playing floor, but upon hearing the appellant's reproach, turned once again toward him. The appellant (135 pounds) pulled his personal knife. Although no altercation resulted, words were exchanged and the appellant left. Appellant testified to his determination to avoid the victim in the future. This was, however, not to be.

The following evening, the appellant, who was again on duty, entered the dining hall where the victim worked as a cook. Greeting friends, he proceeded to the podium where he signed in for a meal. Meanwhile, the victim, standing there, said, "Yeah, I see you got your shit. You're going to need it because I'm going to kick your ass." Appellant responded, "Sure, Cookie, when I'm working you know I have to have one on working." Thinking the victim had left, the appellant took a step back to get a tray. At this point the victim grabbed the appellant by the back of the neck and the shoulder. According to appellant, "I turned around and brushed against the wall to my—I turned to my left. He then placed his hand in my jacket collar and was trying to get his right hand—his left hand up in my throat. He almost had me but I moved around to his right, to my left, and turned and kept trying to jerk away to get his hand off my jacket." The victim continued to say, "You're going to need your shit, because I'm going to kick your ass." Unable to break the victim's hold, the appellant decided to hit him on the shoulder or arm with his gun. "When I pulled the gun, all in the same motion he made a hard jerk on the collar and the gun went off."

Prior to the members' deliberations on the merits of the case, the military judge instructed them on the lesser included offenses of voluntary manslaughter, involuntary manslaughter, and negligent homicide; on the alleged offense of unpremeditated murder; and on the defenses of accident and self-defense. We have reviewed all of these instructions, particularly those on self-defense. A close examination reveals that all such instructions focus on a self-defense test which will justify the use of deadly force. Appellant before us rightly complains that the military judge erred in failing to address the self-defense in the use of less than deadly force; that is, the drawing of the weapon for the purpose of using it as a club. Indeed, after the findings of negligent homicide were returned, the defense requested reinstructions on self-defense relating to an unintentional killing, which was denied.

The members, then, were never given the opportunity to entertain self-defense as a justification for drawing the weapon as a club. Nevertheless the Government urges, "While in hindsight, a more detailed instruction as to negligent homicide might have been useful, this theory was not litigated." This proposition we reject out-of-hand. In fact the appellant's testimony asserts his intention not to shoot, but to use

1. Appellant was sentenced to a bad-conduct discharge, confinement for 1 year, forfeiture of all pay and allowances, and reduction to the lowest pay grade. The convening authority approved the finding and sentence, except for the forfeitures. The intermediate court affirmed.

the gun as a club. Under these facts self-defense is raised not only as applied to the prosecution's theory of intentional shooting, but also to the defense assertion of alternate theories.

 The military judge clearly has a *sua sponte* duty to instruct the court members correctly and fully on all issues raised by the evidence. *United States v. Jones*, 3 M.J. 279 (C.M.A.1977); *United States v. Graves*, 1 M.J. 50 (C.M.A.1975); *United States v. Smith*, 13 U.S.C.M.A. 471, 33 C.M.R. 3 (1963). Under the facts of this record of trial, this military judge failed in his responsibility.

 The court members, in arriving at their verdict of negligent homicide, of necessity decided whether the drawing of appellant's gun was a lawful or negligent act.[2] With the sole issue being whether it was lawful for the appellant to draw his gun under the circumstances, the judge's instructions as they related to negligent homicide were inadequate and misleading. As to negligent homicide, the question becomes whether it was lawful for the appellant to draw his weapon. In instructing the jury, the military judge failed to sufficiently differentiate between the drawing of the weapon versus the use of deadly force; that is, the firing of the weapon. Furthermore, the military judge instructed the members to consider the fact that the appellant was a security policeman who previously received training in the circumstances justifying the use of deadly force. This instruction is misleading because a policeman is often justified in drawing his weapon on an assailant, although he may not be justified in intentionally killing him. In this regard, both Mr. King, a long-term security officer from a nearby civilian police department, and Sergeant Flanagin testified regarding the appropriateness of appellant, as a security policeman, drawing his weapon during attack. Each testified that if subjected to the same situation, he would have drawn his weapon. The military judge was required *sua sponte* to instruct that they were "expert witnesses." The judge's instructions were deficient in that they suggested a great restriction on a security policeman's right, if not duty, to use superior force in subduing his adversary.

 Under these instructions the appellant was limited in his use of force to only that amount which he reasonably believed necessary to protect himself and that he could not use such force as to become the aggressor. The military judge further told the members to consider that there were others in the vicinity who could have come to the appellant's aid. Contrary to these instructions, appellate defense counsel urge that a policeman, unlike a private citizen, has no duty to retreat from an affray and stand idly by to be beaten up with the attendant risk that his assailant will grab his weapon and kill him with it.[3] He further argues that it is a police officer's duty to protect the public as well as to subdue his adversary, and the presence of others does not relieve him of such duty. We agree with these propositions and view the instructions challenged in this case as insufficient and misleading.

The decision of the United States Air Force Court of Military Review is reversed. The findings and sentence are set aside. The record of trial is returned to the Judge Advocate General of the Air Force. A rehearing may be ordered.

EVERETT, Chief Judge (concurring in the result).

In this well-tried case, I would probably conclude that, for reasons suggested in the dissent, the instructions by the military judge were adequate to meet his duty to differentiate *sua sponte* between self-defense in relation to the intentional firing of

---

2. We do not address the doctrine of *res ipsa loquitur*, which has not been accepted in military criminal law. *See United States v. Ryan*, 3 U.S.C.M.A. 735, 738–39, 14 C.M.R. 153, 156–57 (1954). *See also United States v. Bryan*, 19 U.S.C.M.A. 184, 187, 41 C.M.R. 184, 187 (1970).

3. Mr. King, a policeman for 13 years, testified regarding FBI statistics showing that a majority of policemen killed on duty are shot with their own weapons.

the revolver and self-defense in relation to use of the revolver as a club to strike the victim. However, in light of the defense requests for instructions and the colloquy between defense counsel and the judge as to the two separate aspects of the issue of self-defense as raised by appellant's testimony that he only was attempting to strike Sergeant Harrell with the firearm, the instructions are inadequate to make the necessary distinction.

The court members, obviously conscientious and anxious to do justice, requested additional instructions on the findings. Thus, the judge on two separate occasions advised the court members that, "in evaluating whether Sgt. Thomas was performing a lawful act in a lawful manner when, according to his testimony, he drew his weapon in self-defense to repel Sgt. Harrell by striking him with the weapon," they might consider such relevant facts as "whether there were others present in the immediate area who could have assisted Sgt. Thomas; and the fact that Sgt. Thomas was a security policeman who had previously received training on the circumstances justifying the use of *deadly force*." (Emphasis added). Moreover, in advising the court members on self-defense as it pertained to intentional homicide—namely, unpremeditated murder or voluntary manslaughter—the judge twice informed the court members that they might consider these same relevant facts.[1]

The rules of self-defense which govern the drawing of a pistol to use as a club are quite different from those which govern its intentional use as a firearm. However, the manner of the judge's references might have misled the court members into believing that appellant could not lawfully have drawn his pistol to use as a club unless he would have been equally justified in draw-

ing it for the purpose of shooting the victim. Furthermore, since in his lengthy advice to the members—a substantial portion of which was repeated to them—the military judge referred to the appellant's status as a security policeman only in connection with the receipt of "training on the circumstances justifying the use of deadly force," the court members might well have inferred that Sergeant Thomas, as a security policeman, was more limited in the use of force than an ordinary citizen would be. Of course, as the principal opinion makes clear, the reverse is true. Thus, contrary to the thrust of the military judge's instructions, appellant was not required to consider the presence in the immediate area of others who might have assisted him. In defending himself and asserting his authority, a police officer is not required to depend on the assistance of bystanders.

Admittedly, appellant entered the dining hall where the slaying occurred in order to eat supper rather than to enforce any law. However, according to his supervisor, Sergeant Flanagin, he was on duty and simply was being relieved "for chow." When attacked by Sergeant Harrell, appellant wore his pistol and web belt and was carrying the portable radio used by security police at his station. Under these circumstances, appellant was fully entitled to whatever legal immunities are usually inherent in the status of a security policeman.

If the court members had convicted appellant of an intentional homicide, he might be unable to demonstrate prejudice, for the instructional errors would have had their greatest impact on the court members in determining the criminal liability for an unintended discharge of the pistol. However, since the court-martial ultimately found that appellant had not intended to kill or seriously harm his victim, the in-

---

1. The "relevant facts" to which the military judge called the members' attention on four separate occasions were

the relative size and weight of Sgt. Thomas and Sgt. Harrell; their relative physical prowess and fighting ability; the threats made by Sgt. Harrell to Sgt. Thomas during and before the scuffle; the reputation, if any,

of Sgt. Harrell for violence and aggressiveness; whether there were others present in the immediate area who could have assisted Sgt. Thomas; and the fact that Sgt. Thomas was a security policeman who previously received training on the circumstances justifying the use of deadly force.

structional error in the case was prejudicial.[2]

COOK, Judge (dissenting):

In *United States v. Jones*, 3 M.J. 279 (C.M.A.1977), which I authored, the Court unanimously held that the military judge erroneously failed to instruct the court that the accused's

> response to a simple fistic assault was not excessive if . . . [the victim's] death was unintended and not a reasonably foreseeable consequence.

*Id.* at 280. *See United States v. Perry*, 16 U.S.C.M.A. 221, 36 C.M.R. 377 (1966); *United States v. Weems*, 3 U.S.C.M.A. 469, 13 C.M.R. 25 (1953). The basis of that decision was the military judge's failure to distinguish, in his instructions to the court members, the circumstances that justify the use of deadly force in self-defense from those circumstances that do not. The majority here find a similar deficiency. I disagree.

The appellant raised an issue of self-defense as well as an issue of accident. At trial, defense counsel requested an instruction that merged the two defenses, which the military judge rejected. The military judge gave separate instructions on both accident and self-defense. He also divided his instruction on self-defense into two sections: One section related the issue of self-defense and the lawfulness of the appellant's act "in drawing his weapon . . . to repel the assault by striking" the victim; in the other section, he related the self-defense issue to the situation where the appellant intentionally shot the victim, after advising the members that they must be convinced beyond a reasonable doubt that appellant intended to shoot the victim. It is here that the military judge limited the self-defense issue to an honest and reasonable belief by the appellant that he feared death or grievous bodily harm. Accordingly, the military judge correctly set out the circumstances where deadly force can be employed. He did not limit the use of the weapon as a club to the circumstances where only deadly force can be used. Rather, during the initial section of his self-defense instruction, the non-intentional shooting, he instructed:

> It is your duty as members of the court to determine whether or not the degree of force employed by Sgt. Thomas in drawing his weapon in self-defense to repel the assault by striking . . . [the victim] with the weapon exceeded that degree of force which Sgt. Thomas honestly and reasonably believed from all of the circumstances as they appeared to him at the time to be necessary to protect himself from apparent or actual bodily harm.
>
> Now, since there is evidence of accident before the court, the burden is on the prosecution to establish beyond a reasonable doubt that the death of . . . [the victim] was not the result of an accident. Thus, unless you are satisfied beyond a reasonable doubt that the death of . . . [the victim] was not the result of an accident, you must acquit Sgt. Thomas of the offense charged and all lesser included offenses.

Thus, the issue of self-defense was not limited to the situation where deadly force can be employed. Rather, the military judge properly distinguished between use of the weapon as only a club and the intentional shooting of the victim. Appellant was convicted of the lesser included offense of negligent homicide. Accordingly, the court rejected the Government's theory that the shooting was intentional. However, the

---

2. Although the Court did not grant review on the issue, I question the view of the court below that appellant could lawfully be compelled to serve a sentence adjudging the maximum punishment allowed by the Table of Maximum Punishments without receiving any credit for his extensive pretrial confinement. *See Thomas v. United States*, 8 M.J. 504 (A.F.C.M. R.1979). Although 18 U.S.C. § 3568, which calls for credit for time in custody prior to imposition of sentence, contains an express exception for trials by court-martial, it seems inconsistent with the provision for a maximum punishment to allow persons who have been placed in pretrial confinement to be confined in the aggregate for a period longer than the President has authorized. Indeed, such a result poses due process and equal protection problems.

failure to prove intent did not completely exonerate the appellant because the members also concluded that appellant's response in hitting the victim with a loaded revolver was excessive and constituted negligence.

As the evidence of record reflects that appellant was participating in the continuation of a personal feud between himself and the victim that had developed the day before the fatal incident, I do not believe this is the proper case to evaluate the appropriateness of the instruction on self-defense for a police officer in the execution of his duties.

Therefore, I would affirm the decision of the United States Air Force Court of Military Review.