**UNITED STATES, Appellee,**

v.

**Captain John D. WARD, U.S. Air Force, Appellant.**

No. 43984.
ACM 23284.

U.S. Court of Military Appeals.

Oct. 3, 1983.

For Appellant: *Jim Lane,* Esq. (argued); *Michael Sloan,* Esq., *Colonel George R. Stevens, Major Richard A. Morgan* (on brief).

For Appellee: *Major George D. Cato* (argued); *Colonel Kenneth R. Rengert* (on brief).

Opinion of the Court

FLETCHER, Judge:

On May 28, 1981, appellant, contrary to his pleas, was found guilty of: presenting for payment a false and fraudulent claim against the United States; larceny by receiving payment of this claim from the Government; two specifications of obtaining government services under false pretenses; and five specifications of aiding and abetting the making of a false writing in connection with a claim against the United States presented for approval and payment by two other servicemembers, in violation of Articles 132, 121, and 134, Uniform Code of Military Justice, 10 U.S.C. § 932, 921, and 934, respectively.

The members of this court-martial sentenced appellant to be confined at hard labor for 2 years, to forfeit $800.00 pay per month for 24 months, and to be reprimanded. The convening authority approved this sentence. The United States Air Force Court of Military Review affirmed these findings of guilty and the sentence on April 23, 1982. 13 M.J. 626.

This Court granted review, on September 29, 1982, of the following issue:

WHETHER THE MILITARY JUDGE ERRED TO THE PREJUDICE OF THE ACCUSED IN INSTRUCTING THE COURT THAT THE MISTAKE OF THE ACCUSED HAD TO BE BOTH HONEST AND REASONABLE IN ORDER TO ACQUIT THE ACCUSED OF CHARGE I AND ITS SPECIFICATION OR SPECIFICATION 1 OF CHARGE II.

This Court also specified the following issue for review:

WHETHER THE MILITARY JUDGE ERRED TO THE PREJUDICE OF THE ACCUSED IN ALLOWING TESTIMONY FROM MR. BUNDSHUH AND SERGEANT CARTER REGARDING TELEPHONE CONVERSATIONS WITH MRS. WARD.

The Court of Military Review stated the following concerning the factual circumstances surrounding this appeal:

Evidence at trial developed the following facts: The accused, a chaplain was assigned to Clark Air Base, Republic of the Philippines, in October 1978. His church, through a Filipino affiliate church, supported The Way Inn Christian Center as a ministry to service personnel. The Way Inn was located off base and was maintained as a hostel. For some years the results of the ministry had been disappointing, and the building itself had begun to deteriorate. When the accused was transferred to Clark Air Base, his wife was appointed as Director of the Center. While his wife was the nominal director, the accused supervised the day-to-day running of the Center, and was in charge of its operation. He and his wife moved into The Way Inn and lived there during his overseas tour. Servicemembers arriving or leaving Clark Air Base could obtain rooms at The Way Inn, and were expected to donate a sum equal to their Temporary Lodging Allowance (TLA).[2]

Major Eugenie Blakovitz and Senior Master Sergeant Henry E. Williams and their families stayed at The Way Inn upon their arrival at Clark Air Base. The accused gave them receipts when no money had been paid, and certified that meals had been provided when they had not. The accused and Williams "split" the money Williams got for TLA.

In July 1980, Thomas Cardona came to the Philippines as a missionary and assumed the directorship of The Way Inn Christian Center since the accused and his family were to return to the United States that Fall. On approximately 18 August 1980, Mr. Cardona signed a receipt as: "Director, The Way Inn," showing that the accused had paid $530 to The Way Inn for lodging, meals and laundry for himself, his wife, and their two children. Mr. Cardona was reluctant to sign the receipt as no money had changed hands, but the accused convinced him it was proper. On 19 August 1980, the accused received $430.00 from the Accounting and Finance Office as TLA from 12–21 August 1980. During this period the accused was staying in the Director's quarters at The Way Inn where he and his family had lived for the past twenty-two months.

Troubled by his conversation with the accused, Mr. Cardona reported the receipt incident to the Office of Special Investigations (OSI), and later released The Way Inn financial records to that organization.

In August 1980, Sergeant Ida K. Carter, a chaplain's assistant, and the accused entered into a sham sale of the accused's 1975 Chevrolet pick-up truck so that it could be shipped to the United States on Carter's orders.[3] Since she did not own a car, and the accused assured her she "would not get into trouble," she agreed to help him. She paid him no money, and returned all the paperwork to the accused after the truck was shipped.

In August, the accused also asked Paul J. Bandshuh, who was then on active duty and owned no car, to ship a 1977 Chevrolet Caprice Stationwagon on the latter's orders to the United States. Bandshuh hesitated, but agreed after the accused indicated he had just shipped a pickup truck like this, and nothing had gone wrong. Bandshuh never intended to buy the car and paid no money to the accused. It cost the Air Force approximately $3236.00 to ship the two vehicles to the United States.

The accused, testifying only as to the larceny and false claim allegations of 19 August 1980, denied any intent to defraud the Air Force and maintained he had paid the $530.00 to The Way Inn. Additionally, he offered extensive evidence as to his reputation for honesty and truthfulness. He also presented evidence that Mr. Cardona had a reputation for untruthfulness and was antagonistic toward him.

---

[2] Temporary lodging allowances (TLA) partially reimburse a member for the more than normal expenses incurred during occupancy of temporary lodging and expenses for meals where there are no facilities for preparing

them. Joint Travel Regulations, Vol. 1, Part G, para M4303, 4 Jan 1982.

[3] Military personnel can ship one privately owned vehicle to the CONUS at government expense. Joint Travel Regulations Chapter 11, para M1102, 1 Jan 1982.

13 M.J. at 628–29.

## I

The first granted issue relates in part to appellant's conviction of presenting a false claim in violation of Article 132(1)(B).[1] This challenged finding of guilty applies to a specification which reads:

Charge I: Violation of the Uniform Code of Military Justice, Article 132.

Specification: In that CAPTAIN JOHN DEMPSEY WARD, United States Air Force, 3d Combat Support Group, did, at Clark Air Base, Republic of the Philippines, on or about 18 August 1980, by presenting a claim for temporary lodging allowances to Captain Donald Carter, an officer of the United States duly authorized to approve and pay such claim, present for approval and payment a claim against the United States in the amount of $430.00 for temporary lodging allowances from 12 August 1980 to 21 August 1980, which claim was false and fraudulent in the amount of $430.00 in that the said CAPTAIN WARD did not incur expenses of $430.00 which would entitle him to temporary lodging allowances, and false and fraudulent in that permanent housing vacated, 119 Clark Avenue, Villa Sol Subdivision, Angeles City, 12 August 1980 was not vacated on 12 August 1980, and was then known by the said CAPTAIN JOHN DEMPSEY WARD to be false and fraudulent.

The above-granted issue also relates in part to appellant's conviction for larceny in violation of Article 121. This finding of guilty applies to a specification which reads:

Charge II: Violation of the Uniform Code of Military Justice, Article 121.

Specification 1: In that CAPTAIN JOHN DEMPSEY WARD, United States Air Force, 3d Combat Support Group, did, at Clark Air Base, Republic of the Philippines, on or about 19 August 1980, steal lawful currency of a value of about $430.00, the property of the United States.

The evidence in the record of trial makes clear that appellant was convicted of presenting a false claim for $430.00 and receiving payment of this claim in the amount of $430.00 from the United States Government.

The military judge's instructions to the members with respect to these offenses and which form the basis for the first granted issue were as follows:

As used in the specification, the term "false and fraudulent" means deliberately deceitful. They connote the false representation of a material fact made with knowledge of its falsity and with the intent to deceive another.

Now you recall that Chaplain Ward testified in regard to the Specification of Charge I, and Specification 1 of Charge II. Part of his testimony, as I recall, is the fact that while he was in 119 Clark, he was under the *honest and reasonable mistake that what he did was not illegal.* I'm not going to say what his testimony was, that's for you to recall. But I instruct you that based on the defense and evidence that may have been presented to you, that at the time of the alleged offense of those two specifications of the two charges I just mentioned, if the accused was ignorant or mistaken as to a fact, with respect to this case you are advised that if the accused was laboring under an *honest and reasonable mistake or ignorance,* he cannot be found guilty in regard to the specification of Charge I or Specification 1 of Charge II.

MJ: Just to recapitulate, defense counsel, in your opinion, you gave in your argument, the crux of his honest and reasonable mistake is—what was it—in your position? In your opinion?

1. The origin of this statutory offense is discussed in W. Winthrop, *Military Law and* *Precedents* 697–710 (2d ed. 1920 Reprint).

IDC: The crux of it was that he believed, because of the facts and circumstances surrounding the way he was living and where he was living and so forth and because it was not a private residence, that, you know, would be vacated and so on, that he would be entitled to file for the TLA and entitled to collect it.

MJ: All right, thank you.

MJ: I'm not saying that's what you received from his testimony, but if you did receive that from his testimony and if you believe it to be honest and reasonable, then of course he cannot be convicted, as I have just stated, in those two areas; Specification 1 of Charge II and the Specification of Charge I.

Emphasis supplied.

With respect to the charge of larceny, he said,

Element four, that the taking or obtaining by the accused was with the intent permanently to deprive or defraud another person of the use and benefit of the property or permanently to appropriate the same to his own use or for the use of some person other than that of the true owner.

You are further advised that, with respect to the element that the accused wrongfully obtained the property, obtaining property by false pretense is wrongful. A false pretense is a false representation of a past or existing fact. The pretense must be in fact false when made, and the accused must have known it was false. Although the pretense need not be the sole cause inducing the owner to part with his property, it is necessary that it be an effective and intentional cause of the obtaining.

Also, I'd like to instruct you that, if the accused hypothetically was found not guilty of the specification under Charge I, he could not be found guilty of Specification 1 of Charge II and vice versa, because they are related. And I think you can see the reason why, as explained to you by counsel for both sides.

Appellant before the Court of Military Review asserted that these instructions were erroneous. That Court agreed and said:

Now on appeal, the same individual defense counsel asserts contrariwise that the instruction was wrong in that only an honest mistake on the part of the accused is the standard to be used.

He is correct in this assertion since both the larceny and false claim offenses require either specific intent or knowledge. Where a specific intent or knowledge is an element of an offense charged, an honest mistake essential to the required state of mind will constitute a defense. *United States v. Parker,* 28 C.M.R. 785 (A.F.B.R.1959) and cases cited therein. The military judge erred in instructing the court that the mistake must be both honest and reasonable.

13 M.J. at 631. However, it declined to set aside the challenged findings of guilty because it found that the defense had induced this instructional error.

■ The first question we will address is whether the Court of Military Review was correct in holding that the military judge's instructions as quoted above were erroneous. Article 132(1)(B) requires that the prosecution prove beyond a reasonable doubt that appellant presented a claim against the Government "knowing it to be false or fraudulent." The challenged specification includes the words "false and fraudulent," but such pleading does not change the nature of the specific criminal intent required to be shown by the Government. *United States v. Ariola,* 2 U.S.C. M.A. 637, 10 C.M.R. 135 (1953). It must show that the claim was "deliberately deceitful," meaning that appellant made an untrue representation of a material fact knowing it was untrue and with the intent to defraud another. *Id.* at 640–41, 10 C.M.R. at 138–39. *See* § 4–115, *Military Judges' Guide,* Department of Army Pamphlet 27–9 (1969).

■ The Court of Military Review and all parties to this appeal agree that an honest mistake on the part of appellant, without regard to its reasonableness, is a

lawful defense to this charge. Such a conclusion concerning this specific-intent offense is persuasively supported by our case law. *See United States v. Acosta,* 19 U.S.C. M.A. 341, 41 C.M.R. 341 (1970); *United States v. Walters,* 10 U.S.C.M.A. 598, 28 C.M.R. 164 (1959). Paragraph 211a, Manual, *supra,* further states, "The claim must be made with knowledge of its fictitious or dishonest character. This article does not proscribe claims, however groundless they may be, that are believed by the maker to be valid, nor claims that are merely made negligently or without ordinary prudence." This comment applies to the instant offense. *See* para. 211*b,* Manual, *supra.* Accordingly, we agree that the instruction given by the military judge with respect to this offense requiring that appellant's mistake be honest and reasonable was erroneous.

 Appellant was also charged with larceny of the money he received as a result of the Government's payment of the above claim. Article 121(a)(1) requires that the prosecution prove beyond a reasonable doubt that appellant had the specific criminal "intent permanently to deprive or defraud" the Government of the money paid to him in accordance with his temporary lodging allowances claim. Again, our case law persuasively supports the conclusion that an honest mistake on the part of appellant, without regard to its reasonableness, is a valid defense to this charge. *United States v. Sicley,* 6 U.S.C.M.A. 402, 20 C.M.R. 118 (1955); *United States v. Rowan,* 4 U.S.C.M.A. 430, 16 C.M.R. 4 (1954). Accordingly, we also agree that the challenged instruction given by the trial judge with respect to this offense was erroneous.

The second question we will address is whether appellant was prejudiced by these erroneous instructions. Article 59(a), UCMJ, 10 U.S.C. § 859(a). The Court of Military Review did not particularly address this question. Examination of the challenged specifications, the evidence introduced by the Government and trial counsel's opening and closing arguments, reveals the prosecution's alternative theories of

guilt. First, it averred that appellant was "deliberately deceitful" in presenting this claim because he did not vacate his permanent housing as indicated on the claim, which he knew was required to present a valid claim. *See* para. 211*b,* Manual, *supra.* Second, it averred that appellant was "deliberately deceitful" in presenting this claim because The Way Inn had cooking facilities, contrary to his indication on the claim, which he knew was required to entitle him to the full claim of $430.00. Finally, it attempted to prove that appellant was "deliberately deceitful" in presenting this claim because he did not pay any money to The Way Inn as indicated on his claim and knew that he was not entitled to present a claim for this reason.

Appellant testified in his own defense with respect to these two offenses. He stated that when he filed the claim for the temporary lodging allowance, he did not intend to defraud the Government. He stated that he paid $525.00 for expenses incurred by his wife and children as a result of their stay at The Way Inn. He further stated that he believed that he was entitled to file a claim and receive payment for these expenses. Appellant admitted that he had lived with his family at The Way Inn prior to the period for which he had filed the claim. He stated, however, that his wife had been replaced as director of The Way Inn and he then felt a donation was proper to cover the costs of his family's lodging. He further admitted that there were cooking facilities at The Way Inn but not in the rooms for which he made his claim. Finally, he stated that this was the first claim he filed for temporary lodging allowances (TLA), that he was not familiar with "TLA procedures," and had not told people he was.

This testimony by appellant clearly raises the defense of an honest mistake of fact or law. *See* paras. 154a(4), (5), and 214, Manual, *supra.* In substance, appellant testified that he honestly believed he was entitled to file this claim and receive payment for it. The fact that the military judge gave an instruction on honest and reasonable mis-

take based on this same evidence confirms our conclusion. The fact that the Government introduced evidence to the contrary does not abrogate appellant's right to a proper instruction. Since we cannot state with any certainty the theory of guilt upon which the members convicted appellant, we hold that there was a substantial possibility that appellant was prejudiced by these erroneous instructions. Article 59(a). *See Kotteakos v. United States*, 328 U.S. 750, 764–66, 66 S.Ct. 1239, 1247–49, 90 L.Ed. 1557 (1946).

The third question we will address is the correctness of the Court of Military Review's holding that the error in these instructions was effectively waived by defense counsel at trial. The lower court recognized that the decisions of this Court in *United States v. Thomas*, 11 M.J. 315 (C.M.A.1981), and *United States v. Graves*, 1 M.J. 50 (C.M.A.1975), had some bearing on this question.

> We are cognizant of the Court of Military Appeals' mandate in *United States v. Thomas*, 11 M.J. 315 (C.M.A.1981) wherein the Court held that a military judge has a *sua sponte* duty to instruct the court members correctly and fully on all issues raised by the evidence. This decision followed their holding in *United States v. Graves*, 1 M.J. 50 (C.M.A.1975), stating the desires of counsel are not controlling and the military judge bears the primary responsibility for assuring the members are properly instructed on potential defenses.

Yet, it concluded that since the defense counsel induced the erroneous instructions, this case did not fall within the ambit of the above precedents. It stated:

> However, we do not interpret *Thomas*, and *Graves*, both *supra*, to mean that a defense counsel can: repeatedly argue to the jury an incorrect principle of law; when asked by the trial judge, aver this is the theory of the case on which he is defending; affirmatively accept an instruction based on this theory of defense; request no additional instructions; and then, on appeal, claim the wrong instruc-

tion was given. Under these circumstances we hold that, the defense will not be heard to complain of instructional error on appeal. *Jones, supra; Parker, supra.*

13 M.J. at 631.

The earlier decisions of this Court in *United States v. Parker*, 8 U.S.C.M.A. 704, 25 C.M.R. 208 (1958), and *United States v. Jones*, 7 U.S.C.M.A. 623, 23 C.M.R. 87 (1957), concern courts-martial tried before the advent of military judges. In this context, an inexperienced law officer or president of the court not formally trained in the law could quite easily be induced by a defense lawyer to commit legal error. In appellant's case a qualified military judge presided over the proceedings and little chance existed that the trial would be reduced to a mockery as feared in *Parker* and *Jones. See* Article 26, UCMJ, 10 U.S.C. § 826. In addition, the erroneous instructions cannot be fairly said to be induced by defense counsel in the sense intended in *Parker* and *Jones*. In those cases, defense counsel was in substance the moving party requesting the instructions and the presiding officer of the court merely acquiesced in defense counsel's request. Here, the opposite occurred. Defense counsel did not request the erroneous instructions but acquiesced in the instructional pronouncements of the trial judge.

One final point must be made concerning the Court of Military Review's finding of waiver. The lower court apparently overlooked the role the pretrial investigating officer, the staff judge advocate, and trial counsel played in injecting the requirement of honest and reasonable mistake as the standard for appellant's defense to these charges. The first pretrial investigating officer, who also was a military judge, stated in his report:

> In his statement (IO Exhibit 31) the accused declares that he "simply did what I thought was proper based on what I observed others doing." As it stands, that statement when read with the balance of his statement, appears to seek excuse in a mistake of law as opposed to a mistake of

fact. If the accused paid $525 to the TWICC as a donation, believing that in so doing he would be entitled to TLA, his mistake was a mistake of law. Because it appears that such a mistake could vitiate knowledge that the claim was false and fraudulent, his asserted mistake of law could be a defense in this case. *However, a defense based on a mistake of law must be reasonable, (MCM, para 216j, 1969 (rev.)).* In my opinion, the evidence is sufficient to overcome such a defense. Emphasis supplied.

The staff judge advocate stated in his pretrial advice to the convening authority:

b. Assertions by the accused (IO exhibit 31) and others (IO # 2, exhibits 2, 3, 11, 12 and 14) indicate that the individuals involved seek excuse for their actions in ignorance or mistake as to the law or legal [e]ffect of certain known facts, to wit: they did not know there was anything wrong with using the receipts obtained from Ward for amounts other than what was actually paid to him. As a general rule, ignorance or mistake of law, or of properly published regulations or directives of a general nature having the force of law, is not an excuse for the commission of an offense. In regard to Charge I and its specification; Charge II, specification 1; and Additional Charge II and its specifications, such asserted ignorance or mistake of law might be a defense because in order to convict the accused, the Government must prove that they had knowledge that the claims were false and fraudulent. *For such a defense to be successful, the ignorance or mistake must be reasonable.* A feigned ignorance or mistake of law or the legal [e]ffect of certain known facts is, of course, no ignorance or mistake at all. See Manual for Court[s]-Martial, paragraph 216j, 1969 (Rev.) In the present case the evidence appears to be sufficient to overcome such a defense.

Emphasis supplied.

Trial counsel, during his cross-examination of appellant, stated the following to the military judge:

TC: The gist of his testimony is that he has made an honest *and reasonable mistake of law.* He didn't think what he was doing was wrong. We're trying to get into how honest *and reasonable* this could be if in fact he could have simply deposited that money, if it were paid, right here on base.

Emphasis supplied.

■ Under the earlier decisions of this Court, the failure of defense counsel to object in similar circumstances was not considered waiver. *See United States v. Hatter,* 8 U.S.C.M.A. 186, 189, 23 C.M.R. 410, 413 (1957), cited in *United States v. Parker, supra* at 706, 25 C.M.R. at 210. Although we agree with the lower court that defense counsel should have objected to these misstatements of the law,[2] we do not conclude that his failure to do so relieved the trial judge of his paramount responsibility to properly instruct the members. *United States v. Graves, supra.* Accordingly, the challenged findings of guilty must be set aside.[3]

2. We believe that the investigating officer, the staff judge advocate, and trial counsel incorrectly interpreted paragraph 216j, Manual for Courts-Martial, United States, 1969 (Revised edition), in light of the offenses and facts involved. *See generally* R. Perkins, *Criminal Law* 919–48 (2nd ed. 1969). Moreover, it is quite clear on the face of paragraphs 216i and j, Manual, *supra*, that these provisions were not intended to be narrowly construed without regard to the specific examples of their application provided elsewhere in the Manual, *e.g.*, paras. 200a(5), 211a and b, Manual, *supra.*

3. On appeal, defense counsel broadly suggest that appellant was prejudiced by the erroneous instructions of the military judge with respect to the findings of guilty of Additional Charge II, alleging a violation of Article 132, Uniform Code of Military Justice, 10 U.S.C. § 932. There he was found guilty of aiding and abetting two other servicemembers on five occasions in using a false writing in connection with their claims against the Government. *See* para. 211(c), Manual, *supra.* We note that appellant did not testify with respect to these offenses, defense counsel did not request any instruction concerning the defense of mistake with regard to these offenses, and the trial judge did not give the erroneous instructions with respect to these offenses. Accordingly,

## II

The specified issue in this case concerns appellant's conviction for obtaining government services by false pretenses, in violation of Article 134. *See* para. 200*a*(5), Manual, *supra,* for a discussion of false pretense. In particular he was found guilty of two specifications of fraudulently obtaining the shipment of his privately owned vehicle from the Philippines to the United States at government expense. Over defense objection, two government witnesses were allowed to testify as to statements made to them over the telephone by appellant's wife. *See United States v. Zamarripa,* 544 F.2d 978 (8th Cir.1976), *cert. denied,* 429 U.S. 1111, 97 S.Ct. 1149, 51 L.Ed.2d 566 (1977).

Paul Bundshuh, a former member of the Air Force, testified with respect to one of the false-pretense specifications. He stated:

A I believe either in late July or early August of last year he asked me if I would be willing to ship his 77 Chevy Caprice Station Wagon for him to the States because I was not shipping my own. And I said, well at the time I wasn't sure but I'd have to think about it.

Q What do you mean you weren't sure?

A Well I didn't know exactly if it was right or not so I was a little hesitant at first. And I just said I was going to think about it for a while.

Q Did you think about it for a while?

A Yes, I did. And then he approached me again and I said I would because he had said that—I believe it was an Airman then or Sergeant Carter had sent his pickup truck for him and he had no problems. So because she didn't have any problems I trusted him in thinking that nothing was going to go wrong, I said I would send his car for him.

Q What arrangements did you make to transfer that car? Apparently, transfer that car's ownership from him to you.

A First I believe we went to Merchandise Control to take care of the bill of sale. While at Merchandise Control I do not remember if he had stated he had sold it to me or had given it to me. All I remember is arranging the bill of sale there. Then following that I believe we went to the Philippine LTC place, Land Transportation Office, LTO or whatever you want to call it; I'm not sure, and we took care of the registration, the Philippine registration. The same goes there. I'm not sure if he told them he had sold it or had given it to me. But we in the process, got my name on the Philippine registration. After that, he had wrote a little note out saying that I was going to give him permission to pick up the car in New Orleans once it had been shipped. And I signed that note for him. Following that, we went down to Subic Bay. I took care of the arrangements, you know, the paperwork I had to take care of and shipped the car.

Q I would like to show you a document, CAB Form 18, titled Bill of Sale, and it is stapled together with two others, and ask if you recognize that? (Handing it to the witness)

A Yes, I did.

Q Is that your signature on the bottom of it?

A Yes, it is.

Q Is that the car that you allegedly purchased?

A Yes.

Q And what does this say on top there, on the supposed price?

A $1800.00.

Q Did you pay Chaplain Ward $1800.00 for that car?

A No, I did not.

Q Did you intend to pay him $1800 for that car?

A No, I did not.

Mr. Bundshuh later continued his testimony:

this particular assertion of error must be rejected.

Questions by TC:

Q Who had the originals?

A Chaplain Ward did.

Q Did you have the title to the car?

A No, I did not.

Q Did you have the registration to that car?

A No.

Q Would you tell the court, please, what if any contact you had with Chaplain Ward or anybody for that matter, once you returned to the States concerning the car?

A Once I had gone back to the States, I had planned on taking residence in Montgomery, Alabama. While I was there a sister of mine had sent me some mail I had received in Illinois, where I had thought I was going to stay. In the mail was some certified mail from Mrs. Ward. I opened that certified mail, inside was the original copies of the shipping documents and the registration that had my name on it from the Philippines.

Q Did you make any effort to find out why you had received those documents?

A Yes. I called Mrs. Ward and asked her why she had sent me the paperwork.

Q What did she tell you?

IDC: Objection. Hearsay. That's not an alleged admission of the accused. That's third party.

TC: Under the Law of Principals, I believe that is, sir, an admission.

IDC: If Your Honor please, Mrs. Ward is not charged as a principal in anything. She is not a party to this action.

TC: Nor is that necessary, Your Honor.

MJ: Overruled.

Questions by TC:

Q Would you please tell the nature of the conversation?

A During the conversation she had said that John was going to be in some type of trouble if he had stated it was his car and asked if I would just take the car. And I said, "Do you want anything for it?". I said, "Are you sure this is what you want to do?". And she said, more or less that he would be in trouble if he kept it, and if he didn't he might not be in trouble. So I said I would accept the car. She told me the car was in port in New Orleans and that I could pick it up.

Q Did she indicate to you whether or not you would be in trouble?

A No, she did not.

Sergeant Ida Carter testified for the Government with respect to the second specification of obtaining government services by false pretenses. She stated:

A Yes. He asked me would I ship a vehicle for him since I did not have a private vehicle and I could ship one on my orders.

Q How did you respond to that?

A I asked him would I get into trouble and he said no, so I said yes, I will do it.

Q What transactions did you go through in order to effect the transfer of that vehicle?

A We went to Merchandise Control and filled out a bill of sale. On the bill of sale we said I bought the truck for $1800, no money exchanged hands, then we went to the insurance company and transferred the insurance from his name to my name and then we went to the Philippine registration. Then we went to the BX Auto-Pickup and had them ship it to Subic. Whenever they took their papers to send it down to Subic I turned all of my paperwork, with the bill of sale over to the Chaplain Ward so that—and a written statement saying that his son-in-law could pick the truck up at the Port of Wilmington in Long Beach and I was not to see the truck again once it left the auto pick place.

Sometime later she testified:

Questions by TC:

Q Now Sergeant Carter, when you shipped that vehicle from Subic, did you expect to ever see it again?

A No, sir.

Q Have you seen it again?

A Yes, sir.

Q After you arrived in the states, did you have any phone calls or any contact with anybody relating to the disposition of that vehicle?

A Around the 25th of September I got a phone call.

Q What year was that?

A 1980. I got a phone call from Chaplain Ward's daughter saying that there was some problem with the truck, they were sending me the paperwork that I had given Chaplain Ward so they could pick up the paper—

IDC: Your Honor, I'm sorry, is that a phone conversation with the accused? I was just taking a note.

MJ: I think it was the accused's daughter, she stated.

IDC: I object to the contents of any conversation with the accused's daughter and [request that] the court be instructed to disregard what—

MJ: What is the government's position?

TC: First of all this is not hearsay. This is—nothing is being offered for the truth. We're talking about the instructions to Sergeant Carter.

MJ: All right. I instruct the jury that this information is being admitted into evidence, and I'm going to allow it, for the purpose of [the] overall picture in regards to this case. You are not to consider the truth of what anyone told her unless the information came from the accused. The decision that you give the weight of the evidence is your determination. But this is not admitted for the truth of what his daughter said or what his wife said. It is admitted to give you the background of the picture of the case.

　Questions by TC:

Q Would you again talk about the first phone call that you received?

A Okay. I got a phone call from Chaplain Ward's daughter saying that there was some problem with the truck and that Mrs. Ward was trying to get in contact with me to let me know what was going on, that she had sent me the paperwork for the truck. I received that the next day.

Q You say you received that?

A The paperwork.

Q What was the paperwork?

A The bill of sale, the registration papers and everything that came from here.

Q Did Mary Ward actually get in contact with you?

A Yes.—

Q When was that?

A That evening or the next day; I'm not sure if it was her that called me or I called her. She said that Chaplain Ward had been put on Admin Hold for problems concerning the truck and that if I went along with the story that I had bought the truck from them, then neither one of us would get in trouble.

Q Did she explain why she had sent the vehicle registration papers and the bill of sale?

A So that I could pick the truck up.

IDC: If Your Honor please. I'm going to have to object to that question. I thought the witness said a moment ago the daughter sent the papers. And now—

MJ: She said the daughter called her and said that Mrs. Ward would get in touch with her later on, there had been some problem about the truck.

WIT: The daughter sent the paperwork and Mrs. Ward knew that she sent the paperwork to me.

IDC: I knew, Your Honor, that the daughter sent the paperwork. The question was phrased as though Mrs. Ward sent the paperwork. That's why I made—she had testified to it now because I knew that fact.

MJ: Thank you for the clarification. You were talking about receiving some paperwork.

　Questions by TC:

Q So by this time you had received this paperwork, the title and the bill of sale and also you had been in contact with Mary Ward and she had said if you

went along with the story that nobody would be in trouble?

A Right.

Q Up until the time you got that telephone call, did you have any intention of keeping that car, buying that car or whatever?

A No, sir.

Q Did you receive—well, after that first phone call with Mary Ward, were you contacted by the OSI?

A Yes, sir. They contacted me and I went in there, they asked me questions. I lied. I signed the oath that I had indeed bought the truck from Chaplain Ward for $1800 in cash. As soon as I walked out I knew I had made a mistake. I went to see my boss. I went to see a lawyer. I wanted to go back in then and retract my statement. My lawyer told me that I would be in more trouble because I had perjury or whatever you want to call it, and to wait and see how things went since I had— maybe our stories would go along and neither one of us would get in trouble.

IDC: Your Honor, please, I assume the same instructions goes to what her lawyer told her to go with the rest of the hearsay that's come in here.

MJ: Purpose is admitted. We're trying to give you a full picture of the transaction and not to the truth of what her lawyers told her.

The first question we will address concerns the purpose for which the challenged testimony was admitted at appellant's court-martial. See Mil.R.Evid. 105. Trial counsel initially chose to characterize the out-of-court statements of appellant's wife as admissions. See para. 140a, Manual, supra. In this light, her statements were offered for the truth of the matters asserted therein. See Mil.R.Evid. 801(a). The substance of her statements was that she acknowledged that her husband's earlier sales of his vehicles to Bundshuh and Carter were shams. The Government intended to use these admissions to corroborate the testimony of its witnesses on this point and undermine any inference from the docu-

mentary evidence introduced in the case that genuine sales of the vehicles had earlier occurred.

The Court of Military Review held the telephone statements of appellant's wife could be introduced for this purpose under Mil.R.Evid. 801(d)(2)(E). This rule of evidence embraces what was formerly known as the hearsay exception for declarations of a co-conspirator. See Analysis of Mil.R. Evid. 801(d)(2)(E); para. 140b, Manual, supra. It is generally acknowledged that the application of this rule raises several complex and as yet unsettled questions of law and necessitates laying a proper evidentiary foundation at the trial level. See J. Weinstein and M. Berger, Weinstein's Evidence [hereafter cited as Weinstein] §§ 104[05], 801(d)(2)(E)[01] (1979). It is in this regard that the Court of Military Review's holding is suspect.

■ It is true that before an out-of-court statement can be admitted under this rule, the Government must show the existence of an illicit association between the declarant and the defendant. See United States v. Zamarripa, supra. However, serious questions exist as to what evidence may be properly used to show this illegal concert of action. See Weinstein, supra, § 104[05](1). The Court of Military Review did not make it clear in its opinion whether it considered the contents of the wife's telephone statements, the fact that the telephone calls were made, or other evidence independent of the telephone calls to find that a conspiracy existed between appellant's wife and appellant. We think it makes a difference. See United States v. Alvarez, 584 F.2d 694, 696–99 (5th Cir.1978). In addition, the Court of Military Review's opinion did not make clear the scope of the conspiracy between appellant and his wife. Absent sufficient particularity in this regard, we believe that serious questions exist as to the correctness of the lower court's holding. See Krulewitch v. United States, 336 U.S. 440, 442–44, 69 S.Ct. 716, 717–19, 93 L.Ed. 790 (1949); cf. United States v. Coppola, 526 F.2d 764, 770 (10th Cir.1975). It suffices to say that we cannot join the lower

court in affirming appellant's conviction on this basis.

Examination of the record indicates a second purpose existed for admission of the wife's out-of-court statements to Bundshuh and Carter. Both these government witnesses testified that at the time of the sale and shipment of the vehicles, they signed a note authorizing appellant to pick up the vehicles in the United States. They also testified that they turned all the documents pertaining to the vehicles over to appellant and never intended to pick up or see these vehicles again. Yet, they also testified that they did in fact pick up these vehicles in the United States and had possession of the pertinent papers.

■ The testimony concerning the out-of-court statements of the wife of appellant after the sale and shipment of the vehicles explained this apparently inconsistent conduct by these witnesses. *See United States v. Zamarripa, supra* at 982. In this light, these statements had evidentiary value because of the fact that they were made to Bundshuh and Carter and not because the matters asserted therein were true. Evidence that such statements were made was not hearsay when offered for this purpose and was admissible at the court-martial. *Cf.* Mil.R.Evid. 801(c).

■ The next question we will address is whether appellant was prejudiced by any failure by the military judge to properly instruct the members on the limited use of this testimony. We note that the military judge particularly instructed the members that the testimony of Carter concerning appellant's wife's statements over the telephone were not to be considered for the truth of the matters asserted therein but rather as "background of the picture of the case." In view of trial counsel's statement in court that this testimony was offered not for its truth but to show instructions to Carter, we conclude these limiting instructions were adequate. It is true, however, that the trial judge did not expressly give these particular instructions with respect to the challenged testimony of Bundshuh. Yet, we are inclined to conclude that the trial judge's subsequent instructions were broad enough to encompass the proper use of this testimony as well. In any event, defense counsel did not renew his objection to Bundshuh's testimony and particularly request that a similar limiting instruction be given to the members with respect to its use. Mil.R.Evid. 105. Finally, in view of the uncontroverted testimony of the government witnesses indicated above, we hold that there was no possibility that appellant was prejudiced by the trial judge's conduct. Article 59.

The decision of the United States Air Force Court of Military Review as to Charges I and II and the sentence is reversed. The findings of guilty of those charges and the sentence are set aside. The record of trial is returned to the Judge Advocate General of the Air Force. A rehearing on Charges I and II and the sentence may be ordered. If a rehearing on Charges I and II is deemed impracticable, those Charges may be dismissed and a rehearing on sentence held based on the remaining affirmed findings of guilty.

Chief Judge EVERETT concurs.

Judge COOK concurs in the result.