UNITED STATES, Appellee

v.

Brady L. PERRY, Captain, U.S.
Air Force, Appellant.

No. 95–0854.
Crim.App. No. 30766.

U.S. Court of Appeals for
the Armed Forces.

Argued May 22, 1996.

Decided Sept. 30, 1996.

For Appellant: *John A. Wickham* (argued); *Colonel Jay L. Cohen, Captain W. Craig Mullen,* and *Captain Eric N. Eklund* (on brief).

For Appellee: *Captain R. Scott Howard* (argued); *Colonel Jeffery T. Infelise* and *Lieutenant Colonel Michael J. Breslin* (on brief).

*Opinion of the Court*

COX, Chief Judge:

Contrary to his pleas, appellant was convicted by a general court-martial composed of members at Offutt Air Force Base, Nebraska, of larceny and filing a false claim against the United States (2 specifications), in violation of Articles 121 and 132, Uniform Code of Military Justice, 10 USC §§ 921 and 932, respectively. Although appellant was also convicted of conduct unbecoming an officer by preparing false claims, in violation of Article 133, UCMJ, 10 USC § 933, the military judge dismissed this offense as being multiplicious with the other findings of guilty. Additionally, appellant was found not guilty of other specifications alleging larceny, filing false claims against the United States, and making a false statement regarding a matter within the jurisdiction of the United States. He was sentenced to a dismissal and a $3,000 fine. The sentence was approved by the convening authority. The Court of Criminal Appeals affirmed the findings and sentence in an unpublished opinion. 1995 WL 229140. We granted review of the following issue:

WHETHER THERE IS SUFFICIENT EVIDENCE UNDER *JACKSON v. VIRGINIA,* 443 U.S. 307 [99 S.Ct. 2781, 61 L.Ed.2d 560] (1979) AND *UNITED STATES v. TURNER,* 25 MJ 324 (CMA 1987) TO SUSTAIN APPELLANT'S

CONVICTION FOR LARCENY AND FILING FALSE CLAIMS.

■ The Court of Criminal Appeals set forth the following facts concerning the foregoing findings of guilty:

> While assigned at Offutt Air Force Base in 1992, appellant, along with his Air Force captain wife, an Air Force major, and the major's civilian wife, established a business to produce and sell commemorative lithographs. They pooled their resources and commissioned an artist to create a lithograph commemorating the stand-down of Strategic Air Command. They arranged for a limited printing of 750 copies of the lithograph, with each print numbered consecutively and signed by the artist. In addition to the 750 numbered prints, the printers also provided them with a supply of unnumbered prints that they could use as replacements if any of the original prints were damaged. Based on testimony at trial, the cost per copy was approximately $2. After discussing what customers might be willing to pay for the item, they initially agreed to sell the prints for $40 a copy. They began advertising and marketing the prints under the name "L & P Artworks." As the only civilian in the group, the major's wife was the bookkeeper and was the key player in soliciting sales.

> On a number of occasions, L & P Artworks deposited lithographs with United Parcel Service or the United States Postal Service for shipment to customers. Appellant and his associates agreed that the prints should be insured for $100 when they were placed in shipment, even though the cost of the prints was only about $2 a piece and the advertised selling price was only $40. Both the United Parcel Service and the United States Postal Service advised that the value of an item did not have to be established at the time of shipment. However, when loss or damage happened, both the United Parcel Service and United States Postal Service required claimants to establish the amount of the damage or the value of any item lost.

> As sales of the prints progressed, the group discovered the prints were highly susceptible to damage during shipment. Although they changed the type of container used for shipment, damage continued to occur. When damage occurred during shipment, purchasers were told to return the damaged prints. L & P Artworks replaced the damaged item using the extra prints which the printer had delivered to them. The extra print was assigned the same number as the damaged one. The artist, who had signed the original prints, agreed to sign any prints used as replacements for free. Consequently, L & P Artworks was able to replace any prints damaged during shipment without incurring significant costs.

> When the major and his wife received an assignment to England, appellant and his wife negotiated to buy them out. The departing couple received $1200 for their share of L & P Artworks when they left Offutt in early July 1992. At that time, appellant became the principal operator of the business. All of the offenses for which appellant was convicted occurred after appellant and his wife took over the business.

> In order to increase sales, appellant and his wife reduced the selling price of the prints in early July 1992 to $29.95. However, appellant continued to claim $100 for each print damaged during shipment. When asked to substantiate the amount claimed from the United Parcel Service or the United States Postal Service, appellant indicated that the amount claimed represented the value of the item. He referred to the fact that the item would appreciate in value over time, that L & P Artworks had agreed to insure the prints for $100, and that $100 was the indicated value of the item at the time it was shipped. On the three specifications for which appellant was convicted, he actually substantiated the damage claims with receipts in his own handwriting purporting to show that the prints had been sold for $100 each, plus tax and shipping.

Unpub. op. at 1–3.

As a rational trier of fact could have found the foregoing information from the evidence

presented during appellant's court-martial, we are obligated to accept the statement of facts. *United States v. Curtis,* 44 MJ 106, 148 (1996), quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). We proceed now to examine these facts to determine if all the essential elements of the crimes were proven by the prosecution.

The elements of the offense of larceny under paragraph 46b(1), Part IV, Manual for Courts–Martial, United States (1995 ed.), are:

(a) That the accused wrongfully took, obtained, or withheld certain property from the possession of the owner or of any other person;

(b) That the property belonged to a certain person;

(c) That the property was of a certain value, or of some value; and

(d) That the taking, obtaining, or withholding by the accused was with the intent to permanently deprive or defraud another person of the use and benefit of the property or permanently to appropriate the property for the use of the accused or for any person other than the owner.

Under paragraph 58b(1), Part IV, Manual, supra, filing a false claim against the United States requires proof:

(a) That the accused made a certain claim against the United States or an officer thereof;

(b) That the claim was false or fraudulent in certain particulars; and

(c) That the accused then knew that the claim was false or fraudulent in these particulars.

█ In the present case, appellant was alleged to have committed the larceny by false pretense, which required proof that the pretense was false and that appellant knew it was false "in the sense that it [was] made without a belief in its truth." Also, "it must [have been] an effective and intentional cause of the obtaining." Para. 46e, Manual, *supra;*

*United States v. Bethas,* 11 USCMA 389, 29 CMR 205, 1960 WL 4481 (1960). As to the two specifications alleging false claims, we noted the following in *United States v. Ward,* 16 MJ 341, 345 (1983):

> The challenged specification includes the words "false and fraudulent," but such pleading does not change the nature of the specific criminal intent required to be shown by the Government. *United States v. Ariola,* 2 USCMA 637, 10 CMR 135 (1953). It must show that the claim was "deliberately deceitful," meaning that appellant made an untrue representation of a material fact knowing it was untrue and with the intent to defraud another. Id. at 640–41, 10 CMR at 138–39. *See* § 4–115, *Military Judges' Guide,* Department of the Army Pamphlet 27–9 (1969).

As observed in the quoted findings of fact by the Court of Criminal Appeals, appellant provided documentation to support his claimed value, which was prepared in his own handwriting, reflecting the sale of the items for $100.00 per copy when, in fact, no such transaction had ever been consummated. Here, appellant has challenged his conviction on the basis that the prosecution failed to prove the requisite knowledge and intent. Appellant was convicted on the theory that the difference ($60.00 per copy) in the proffered sale price ($40.00) and the claimed value ($100.00) constituted an area where all the criminal elements could be found.* Reduced to basics, this case involves an accused who, when required to substantiate a claimed value of an item, responded by manufacturing documents that were false in fact. We hold that a rational trier of fact could find the requisite intent and knowledge.

The decision of the United States Air Force Court of Criminal Appeals is affirmed.

Judge CRAWFORD and Senior Judge EVERETT concur.

---

* One of the offenses was alleged as larceny because appellant actually received payment for the claim.

SULLIVAN, Judge (dissenting):

This case is not as simple as the majority asserts. As I see it, the question before this Court is whether there is *any evidence* supporting the following factual finding made by the Court of Criminal Appeals and relied on by this Court to show deceit. The lower court said, "On the three specifications for which appellant was convicted, he actually substantiated the damage claims with receipts in his own handwriting purporting to show that the prints had been sold for $100 each, plus tax and shipping." Unpub. op. at 3. I see no evidence in this case that these writings were offered by appellant to the post office as receipts for actual sales of the prints, or were received by the post office as anything other than an invoice. More importantly, the majority does not identify such evidence in its opinion.

Turning first to the prosecution's case, its principal witness, Mr. Martin, the window clerk at the Offutt Air Force Base Post Office, established that these writings were invoices, not receipts. He testified:

Q: How do you recognize this document?

A: Well, I don't know if I had anything to do with this one or not. It's a postal claim for damages or a loss.

Q: Let me direct your attention to Prosecution Exhibit 22, page 1. Do you recognize that?

A: Yes, that's one that I had something to do with.

Q: How do you recognize that?

A: Well, a customer came in with a damaged good and put in a claim and plus that, we give them forms to fill out and after it is filled out properly *and we get the invoice or receipt or whatever is necessary to prove the value,* we take the goods and sent them downtown.

        *      *      *

Q: Did you have any discussion regarding how to prove the amount claimed or value?

A: How to—

Q: How to substantiate the amount claimed?

A: *Well, the gentleman that came in with the claim already had—we just asked for proof of value and we—I believe he gave me an invoice.*

Q: Let me ask you to turn to Prosecution Exhibit 21, page 4, 5, and 6. Do you recognize those documents?

A: *Well, that looks like the invoice that was given to—*

Q: Does that appear to be the invoice that he gave you?

A: It looks like it, right.

Q: Was there any discussion about that invoice?

A: No. It looked genuine to me and I just took it in at the time.

Q: *Did you require anything else other than the invoices?*

A: *Nothing. I required nothing else other than the invoice.* If there is any problem it usually starts with Becky, if she would not accept it.

(Emphasis added.)

Turning to appellant's testimony, he also describes these writings as invoices. He testified:

And I mentioned, I had talked to her [his sister] about this venture because she had done other things on this, well, not on this nature. She had owned a restaurant, fast food restaurant, and she had two, I guess, two fast food restaurants and she had been in some sort of business and I told her about this and she said it was really good. And I asked her, I said, well, would you— these are doing well up here and we're— let's see, this is October, and we're getting ready to go so we've, it seemed like we may have saturated the market up here, for a better word, so I asked her, why don't you try selling some there, and I'm sure that you can get a good price for them or something to that effect. And that's when I sent her these five tubes with five lithographs in each one to sell for $100.00 each down there.

Q: You sent five lithographs per tube and five tubes?

A: In five separate tubes.

Q: Now had there been any discussion between you and her as to what she would sell them for?

A: Not exactly, a price, no.

Q: Did you include some receipts or documents when you sent those to her?

A: I sent her some, yes, some receipts in there with it, with each number—with the number of each lithograph in the tubes at $100.00 each.

Q: *Why did you do that?*

A: *I guess for a better word, to tell her that that's what we should try to sell them for down there.*

Q: Okay, did you do this—did you ever instruct her to damage the tubes and try to make claims on them?

A: No.

Q: Did you—was it your intent to try to make claims on these when you mailed them to your sister?

A: No.

Q: Did you know that they were going to be damaged when you mailed them to your sister?

A: No.

Q: Back to Inspector Mitchell for a second. How many of these prints did you sell all total?

A: I couldn't tell you exactly. Roughly, at the time we bought out the Lairds, I believe we had around 350 left, but that would be a real rough guess.

Q: Now when was the first time that you yourself actually submitted a claim either to United Parcel Service or to the Postal Service?

A: When?

Q: Yes, do you recall?

A: I couldn't tell you exactly.

Q: If you don't recall the date, do you remember the first incident in which you had to make a claim?

A: It seems like the first one was this one when I went to the—well, UPS or a claim, any claim?

Q: Right. Well, let's—whatever you think happened first.

A: From the best, from what the best I can remember even after looking at all the documents, I suppose, I remember going to the Papillion Post Office and showing them the damaged lithograph and asking them what to do and the claim paperwork,

I remember getting the claim paperwork and asking them some general guidelines on how to fill it out. I filled out what I thought was correct on the form and they said, well, you need a receipt or something to, I guess, justify the dollar amount you're claiming. And I didn't understand exactly what he meant so—and he said, well—on, I didn't have the original, I didn't have a receipt for this one and he said if you don't have one, then—but I think I did mention something about well, I've got these, the receipt books, what we fill out to send to everyone else. He said, well, then you could just write on there, write up another receipt for the value that you're claiming for your insurance.

Q: Did you, at that time, what was your belief as to what you were entitled to collect on insurance?

A: I believed, well, I believed we were—the value of our lithographs, what we had agreed on, and it was—at this time I'm not sure, well, we believed we were—we could collect a $100.00, what we had agreed on for the value of each lithograph that was damaged.

Q: Did this postal employee, if you remember, did he ever ask you how much you were selling these prints for?

A: No.

(Emphasis added.)

Finally, documentary evidence in this case supports appellant's claim. PS Form 3812, Jan. 1990, states in Block 13, "Describe, using trade names if known, only those articles lost or damaged and specified value of each. Attach invoice if available or evidence of value." PS Form 1000, September 1992, states in Block 10, "Attach evidence of value (*See* cover sheet, item 2, for acceptable evidence.)" The cover sheet in turn states:

**You need three things to file a claim:**

1. Your original mailing receipt for insured, COD, registered, or Express Mail.

2. Evidence of value, such as a sale receipt, invoice or bill of sale, statement of costs for reconstruction of Express Mail documents.

Either sender or addressee may furnish evidence of value.

3. Proof of loss or damage:

This case is simple only if one assumes that evidence exists to support the lower court's factual conclusion of deceit.

GIERKE, Judge (dissenting):

I cannot accept the factual premise for the majority opinion. My problem is with the last sentence quoted by the majority from the opinion of the court below: "On the three specifications for which appellant was convicted, he actually substantiated the damage claims with receipts in his own handwriting purporting to show that the prints had been sold for $100 each, plus tax and shipping." 45 MJ at 340. I do not believe that this factual assertion by the court below is supported by the record. Unfortunately, the majority erroneously accepts the factual premise of the court below, reciting: "As a rational trier of fact could have found the foregoing information from the evidence pre-sented during appellant's court-martial, we are obligated to accept the statement of facts." 45 MJ at 340–41.

The so-called "receipts" actually are invoices accompanying several prints consigned by appellant to his sister, who had agreed to try to sell them. The postal employee's testimony refers to the documents as invoices. The OSI agent, Special Agent Nazarro, testified that when he interviewed appellant, "he said that no money had actually exchanged hands...." There is nothing on the "receipts" reciting an exchange of money. I have found nothing in the record to show that appellant represented that a sale of the claimed items had occurred. A legitimate dispute about the actual value of works of art does not prove a larceny. In my view, no reasonable factfinder could find *mens rea* from this legitimate dispute about the value of works of art. In the absence of evidence of appellant's intent to deceive postal authorities, I am not willing to affirm this conviction. Accordingly, I dissent.